## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

NEIGHBORS AND NEIGHBORS
ASSOCIATION, INC., a Florida
not for profit corporation,

      Plaintiff,

v.

KEON HARDEMON, individually, and
MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,

      Defendants.

_____/

## COMPLAINT

COMES NOW, Plaintiff Neighbors and Neighbors Association, Inc., by and through its attorneys, Ravindran Law Firm, PLLC, sues Defendants Keon Hardemon and Miami-Dade County and states as follows:

## INTRODUCTION

1.     One of the core protections of the First Amendment is its prohibition against government officials retaliating against private citizens for supporting political opponents or participating in public assemblies. The Supreme Court has affirmed that the right to petition is "among the most precious of the liberties safeguarded by the Bill of Rights" and ranks "high in the hierarchy of First Amendment values." *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018).

2.     Plaintiff Neighbors and Neighbors Association, Inc. ("Plaintiff" or "NANA"), is a non-profit community development organization that advocates for low and middle-income residents of Miami-Dade County. As a part of its core mission, NANA participates in Miami-Dade County's Infill Housing Program (the "Program") to develop surplus county land into safe and

1

affordable single-family and multi-family housing in ground-up construction projects for low and middle-income residents of the Liberty City area of Miami and elsewhere in Miami-Dade County (the "County").

3.      Defendant Keon Hardemon ("Hardemon"), a member of the Miami-Dade Board of County Commissioners representing County Commission District 3 ("District 3"), (which encompasses Liberty City, Little Haiti, and Allapattah) violated the First Amendment by retaliating against Plaintiff because its Executive Director Leroy Jones and other members of its leadership supported Commissioner Hardemon's rival in the 2024 District 3 Commission race and criticized Commissioner Hardemon's leadership and policies in public comment on the floor of the Miami-Dade County Commission.

4.      Commissioner Hardemon has done this by wielding as a cudgel his ability to extend the timeframe to complete development of lots deeded under the Program. Specifically, he has unlawfully and unreasonably refused to enable a vote on an extension of NANA's right to develop thirty lots in Liberty City and Little Haiti deeded under the Program for badly needed low and middle-income housing, resulting in (a) those lots being subject to repossession by the County, and (b) NANA being completely unable to access $7.7 million dollars in construction financing it had previously secured for development of those lots, the release of which was contingent on NANA obtaining an extension of its development rights.  Hardemon has done this despite entering an express written contract with NANA where Hardemon agreed to bring a resolution extending NANA's development rights.

5.      This action seeks injunctive and declaratory relief, as well as damages that NANA has incurred because of Commissioner Hardemon's unlawful and unconstitutional retaliation

against NANA, both in his personal capacity and as an ultimate policy maker for Miami-Dade County.

## JURISDICTION AND VENUE

6.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

7.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and over common law state law claims under 28 U.S.C. § 1367.

8.     Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

9.     Plaintiff NANA is a non-profit Florida corporation. Its principal office is located at 5120 NW 24th Ave, Miami, Florida 33142, and its registered agent is Josette Elysee.

10.     Defendant Miami-Dade County is a political subdivision of the State of Florida and was the employer of Keon Hardemon.

11.     Defendant Keon Hardemon was, at the time of his actions giving rise to this case, the Commissioner representing District 3 on the Miami-Dade County Board of County Commissioners.  As such, he was the chief policymaker for Miami-Dade County related to the government action set forth below.  He is sued in both his individual and official capacities.

12.     At all times relevant to this lawsuit, Commissioner Hardemon was acting under the color of state law and engaged in the conduct complained of while on duty and in the course and scope of his employment with Miami-Dade County.

## GENERAL ALLEGATIONS

### i.      Miami-Dade County's Housing Crisis

13.      Miami-Dade County is currently facing a severe housing crisis. It ranks among the most cost-burdened regions in the United States, with approximately half of all households spending 30% or more of their monthly income on housing expenses.[1]

14.      County officials have acknowledged the direness of the situation. In an April 2022 press release, Miami-Dade County Mayor Daniella Levine Cava stated, "Miami-Dade is where the American Dream is in full swing, but over the past year, we have become one of the most unaffordable regions in which to live – stifling that opportunity for many and hurting our working families."[2]   The press release also outlined key strategies the County intends to pursue in addressing the crisis, including providing alternative funding sources for developers, incentivizing sustainable construction, and streamlining the building process.  *Id.*

### ii.      The County's Infill Housing Initiative Program[3]

15.      One strategy employed by the County to address the affordable housing crisis is the Infill Housing Initiative Program (previously defined as the "Program"). The Program aims to facilitate development of affordable housing for eligible income groups and to revitalize communities by eliminating vacant or deteriorated properties.

16.      Through the Program, the County transfers surplus County-owned parcels to both for-profit and nonprofit developers at nominal cost, with the goal of constructing single-family homes and multi-family rental units for low- and middle-income residents. Developers compete

---

[1] Miami-Dade County. (2023). *Miami-Dade Housing Needs Assessment.*  https://static1.squarespace.com/static/63f24d816c4950456a945f3c/t/6543dfda76ca4b1aeb56d935/1698947034978/Miami-Dade+Housing+Needs+Assessment+2023.pdf
[2] https://www.miamidade.gov/releases/2022-04-08-mayor-housing-crisis.asp?utm_source=chatgpt
[3] Program guidelines are available at https://www.miamidade.gov/housing/library/guidelines/infill/infill-housing.pdf

for these parcels by submitting proposals, which are evaluated based on criteria such as prior experience, financial capacity, and the quality of their development plans.

17.     If selected, a developer receives the surplus property from the County subject to several conditions and deed restrictions. These include requirements to construct affordable housing units that adhere to price caps and to meet specific architectural and size standards, in addition to complying with all applicable permitting and code requirements. Notably, and as is relevant here, developers must obtain a certificate of occupancy within a designated period—typically two years from the property conveyance date for single-family homes and five years for multifamily developments.

18.     If a developer fails to meet Program requirements or does not secure a certificate of occupancy within the specified timeframe, the County has the right to reclaim the property and return it to its inventory.

19.     Prospective homebuyers under the Program are also subject to certain eligibility conditions. Buyers must demonstrate income qualification, complete a homeownership training course, obtain financing, and undergo an approval process that includes application fees and credit checks.

### iii.     NANA's Participation in the Program

20.     Founded in 1995, NANA is a nonprofit organization focused on promoting small business development and affordable housing in historically underserved and economically disadvantaged areas of Miami-Dade County.

21.     NANA has a long-standing relationship with the County and serves as one of its leading grant administration partners. Over the years, NANA has consistently ranked among the County's most successful nonprofit partners in the area of economic development.

22.     In 2016, NANA, in partnership with CRC Leadership, Inc., applied for and was awarded 35 properties under the Program by the Miami-Dade Board of County Commissioners. These properties were deeded pursuant to County Resolutions Nos. R-958-16 and R-556-17.

23.     The resolutions authorizing the deed conveyances were sponsored by then–District 3 Commissioner Audrey M. Edmonson.  Edmonson served as the District 3 Commissioner from 2005-2020, when she was term-limited and succeeded by Commissioner Hardemon.

24.     The Miami-Dade County Commission unanimously approved Commissioner Edmonson's resolutions to deed NANA the thirty-five Program lots.

25.     Of these thirty-five Program lots, twenty-eight were zoned for the construction of single-family or duplex homes, while seven were zoned for multifamily development and slated for the construction of seventy-unit residential complexes. All the lots are located within District 3.

26.     The deeds were granted subject to the standard Program condition that construction be completed within two years for the single-family and duplex lots or five years for the multifamily projects.

27.     Naturally, development on such a scale could not be completed within such an accelerated window.[4]  Rather, this expedited timeframe was intended to serve as a guidepost to promote County oversight and prevent inaction on County-owned land. Under the Program, any extension of a lot's development timeline must be approved by a vote of the full Commission.

---

[4] Among other reasons, this was because the County made developers responsible for much of the predevelopment work for lots conveyed under the Program.  For example, the County did not conduct due diligence to clear title, and required the developers to obtain environmental clearance, zoning compliance, and plat waivers for the deeded properties before breaking ground.

However, only the Commissioner representing the district where the lot is located has the authority to place a resolution for such an extension on the Commission's agenda.

28.     In practice, the Miami-Dade Board of County Commissioners has regularly authorized deed extensions for developers participating in the Program, including issuing multiple extensions for NANA's pending projects under the Program.

29.     Such extensions were regularly sought and granted because of challenges facing the construction industry over the last few years.  Like many developers, NANA encountered significant delays due to the COVID-19 pandemic, including labor shortages and supply chain disruptions. Further, updates to the Florida Building Code required modifications to NANA's architectural templates for the single-family lots. These challenges compounded the typical hurdles faced in development, such as financing delays, platting, right-of-way dedications, and setback determinations.

30.     Despite these obstacles, NANA successfully obtained architectural plans for each of the lots slated for development.[5]

31.     Four of the lots were completed and purchased by Program buyers.  Images of some of the finished homes, which are located in Liberty City, appear below:

---

[5] One of the lots was returned to the County because encroachment by a neighboring lot made developing the lot impossible.





32.     Of the twenty-five lots remaining, eighteen are designated for single-family or duplex development and seven are designated for multifamily development.  Of the single-family and duplex lots, permits have been secured for fourteen, and construction has commenced on

eight of them. However, as detailed below, progress on those eight lots was halted due to Commissioner Hardemon's retaliatory withholding of a resolution that would have further extended the development timeline. Without this extension, NANA was unable to obtain the release of $7.7 million in previously approved construction financing from lenders, which was contingent on NANA obtaining the extension, effectively freezing the projects.

### iv.   Hardemon Seeks to Retake the Infill Lots from NANA

33.     After Commissioner Hardemon joined the County Commission in 2020, he had sole control over whether any further extensions of the development timetable for NANA's thirty Program lots would be put to a vote before the full Commission.

34.     Because the deeded lots were located within District 3, only Commissioner Hardemon, the local Commissioner, had the authority to place matters related to those lots on the County Commission's agenda for official action.

35.     Accordingly, beginning in August 2022, NANA staff engaged in a series of communications with Commissioner Hardemon's office to discuss the ongoing challenges impacting the projects and to emphasize the need for extending the development deadlines for the thirty incomplete properties.[6]

36.     In 2022 and 2023, Commissioner Hardemon agreed to introduce resolutions related to deed extensions and other matters concerning the lots. The County Commission subsequently unanimously approved the proposed extensions, recognizing that NANA had been diligently pursuing development of the lots since 2017 but had encountered difficulties beyond its control due to the COVID-19 pandemic.

37.     The most recent extensions granted to NANA were scheduled to expire on January 31, 2024. Commissioner Hardemon through correspondence from his office indicated he would

---

[6] A list of the subject properties listed by folio number is attached hereto as **Exhibit A**.

not support any further extension to the development timeline unless NANA agreed to return the seven multifamily-zoned lots to the County—lots that Commissioner Hardemon has stated have an estimated market value exceeding 15 million dollars.  If reverted, these lots would be available for Commissioner Hardemon to award under the Program.

38.     Following Commissioner Hardemon's stating his intention to revert the multifamily development lots, NANA's Executive Director, Leroy Jones, along with other community leaders, mobilized public support. This included endorsements from prominent members of the clergy who backed NANA's ongoing efforts to bring affordable housing to Liberty City. Ultimately, Commissioner Hardemon withdrew his condition requiring the return of the multifamily lots as a prerequisite for the extensions. In a letter dated November 28, 2023 (attached hereto as **Exhibit B**), Commissioner Hardemon confirmed he would seek approval from the Board of County Commissioners for an additional one-year extension of NANA's development timeline.

39.     NANA staff worked collaboratively with Commissioner Hardemon's office to draft an extension resolution to be submitted to the Commission (attached hereto as **Exhibit C**).

40.     In reliance on Commissioner Hardemon's stated commitment to present the extension resolution, NANA successfully secured $7.7 million in construction financing from government programs and nonprofit lenders, the release of which was contingent on Commissioner Hardemon filing an extension resolution as a first step to obtaining an extension on the development timeline.

**v.     NANA's Leadership Supports Audrey Edmonson in the 2024 District 3 Election**

41.     Commissioner Hardemon and Audrey Edmonson are long-standing political rivals. Commissioner Hardemon previously unsuccessfully challenged Edmonson for the District 3 seat in 2012.  After Edmonson was term-limited in 2020, Commissioner Hardemon won the seat.

42.     NANA's Executive Director, Leroy Jones, is a longtime community organizer and activist with a strong public presence throughout District 3. His leadership and advocacy have earned him significant recognition within the community.

43.      In the 2024 District 3 Commission election, Edmonson ran to retake the seat from Commissioner Hardemon, now the incumbent. Jones was an outspoken supporter of Edmonson during the campaign—publicly endorsing her, participating in campaign events, speaking on her behalf at community meetings, and routinely criticizing Commissioner Hardemon in various media appearances.

44.     On July 22, 2024, during an NAACP-sponsored District 3 candidate forum, Commissioner Hardemon stated, **"*Elections have consequences. You can't expect me to give Audrey Edmonson's group, that has harmed me time and time again, the same resources they've had before.*"** These remarks were clearly directed at NANA and its leadership. At the time of this statement, the resolution to extend NANA's development timeline for thirty Program lots—one that Commissioner Hardemon had previously committed in writing to support—had remained on his desk since around November 2023, awaiting submission to the County Commission for consideration.

### vi.     Hardemon Retaliates Against NANA Based on Speaker Comments at a January 22, 2025, Board of County Commissioners Meeting

45.     At the January 22, 2025 meeting of the Miami-Dade County Board of County Commissioners, members of NANA and another nonprofit organization, Circle of Brotherhood, Inc. ("Circle of Brotherhood"), attended to speak on an agenda item related to affordable housing.

46.     Circle of Brotherhood is a nonprofit organization dedicated to poverty alleviation and the prevention of gun violence within underserved communities in Miami-Dade County.

47.     At the last minute, the housing item that NANA and Circle of Brotherhood attended the Commission meeting to speak on was removed from the agenda.  During the public comment portion of the meeting, Lyle Muhammad, Executive Director of Circle of Brotherhood, addressed the Commission on the topic of discretionary funding, which was on the agenda. In his remarks, Muhammad stated, "I'm sending out a warning to Commissioner Keon Hardemon in reference to Leroy Jones." At that point, Commission Chair Anthony Rodriguez immediately cut off the microphone, citing a Commission rule prohibiting members of the public from naming individual Commissioners during public comment. Commissioner Rodriguez then instructed bailiffs to escort Muhammad and other attendees from the chambers.[7]

48.     Commissioner Hardemon was not in attendance during this part of the meeting.

49.      Later in the meeting, Commissioner Hardemon addressed the Commission and made a series of disparaging remarks about NANA, likening the organization to a "gang" and accusing it of engaging in behavior akin to "terrorism." He also referred to either Leroy Jones or Lyle Muhammad as a "thug in a polo shirt." Commissioner Hardemon further stated that he did not feel comfortable allocating public funds to individuals who, in his view, were threatening him and his family. He then moved for the immediate suspension of all payments to both NANA and Circle of Brotherhood pending an administrative review. Commissioner Hardemon asserted that it was "preposterous" for the Commission to "force [him] to continue doing business with individuals that have threatened [him]."

50.     The comments made by Muhammad during the public comment period were video recorded. At no point did Muhammad make any threats toward Commissioner Hardemon or any other member of the Commission. Rather, Muhammad criticized Commissioner Hardemon for

---

[7] https://www.miamiherald.com/news/local/community/miami-dade/article299029780.html

what he characterized as a betrayal of low-income residents in District 3—whom Muhammad described as "the least, the lost, and the left out"—by failing to follow through on promises made to the community.

51.     In response to Commission Chair Anthony Rodriguez's clarification that the suspension motion was premised on the comments made to Hardemon by Muhammad—Commissioner Hardemon stated, "It is exactly why I am making this motion [to suspend funding]. This organization has expressed itself a number of times in my first tenure, and I have yet to come out and say anything disparaging."  Commissioner's Hardemon's comments made clear that his efforts to suspend NANA's funding were in response to the exercise of the permissible and protected free expression of ideas on the Commission floor.

52.     Rodriguez also pointed out that Leroy Jones had not made any threats and questioned whether NANA should be subject to Commission action based solely on a purported threat made by Muhammad, who is affiliated with Circle of Brotherhood. In reply, Commissioner Hardemon argued that the two organizations were "inexplicably (*sic.*) intertwined," adding, "When you see one, you see the other. There is no distinction amongst them."

53.     At the same meeting, after publicly pronouncing his intent to exact political retribution against NANA for the political speech of someone who Hardemon associated with them, he followed through, proceeding with the motion that froze NANA's funding.

54.     While the freeze ended up being temporary, it damaged NANA, as it required the diversion of staff resources to deal with the looming crisis.

55.     NANA's board had to hold multiple meetings to develop plans and strategies for what would happen if the freeze was made permanent, exploring loans and alternative sources of fundings to keep the organization afloat.

56.     This diverted staff and organizational manpower away from the actual programs that make up NANA's day-to-day work as a non-profit, to focusing on how to best pay staff and keep the doors open if the worst came to pass.

57.     Ultimately, as a part of the Commission's suspension of NANA's funding, a review conducted by the Mayor's Office concluded that NANA was in compliance with all applicable grant program requirements for eighteen of the nineteen grants it held with Miami-Dade County.[8] The sole exception to NANA's compliance was the Infill Program, which it was not in compliance with only because of Commissioner Hardemon's unwillingness to bring an extension resolution to the County Commission.

58.     Though NANA's funding was not suspended in the end, the chilling message was sent loud and clear: if someone dared to oppose Hardemon, he would exact political revenge in any way he could, even if it meant crippling – temporarily or permanently – an organization that provided much needed services to his own constituents.

### vii.    NANA Receives a Notice of Default on its Program Lots

59.     On February 25, 2025, NANA received a Notice of Default from the County's Office of Community and Housing Development. The notice stated that NANA's Program lots were in default due to the failure to obtain certificates of occupancy. It warned that unless the default was cured within 30 days—meaning the homes were constructed and certificates of occupancy issued—the County could exercise its option to revert the thirty properties listed on Exhibit A. NANA was obviously unable to construct the homes and obtain certificates of occupancy within the 30-day cure period.

---

[8] https://www.miamiherald.com/news/local/community/miami-dade/article299029780.html

60.     Leroy Jones's public support of former Commissioner Audrey Edmonson in her 2024 campaign to unseat Commissioner Hardemon, and the protected speech of Muhammad's criticisms of Hardemon, ultimately sealed NANA's fate in its effort to complete these critical affordable housing developments.

61.     Commissioner Hardemon unreasonably refused to submit the extension resolution to the County Commission, despite the resolution sitting on his desk since November 2023. He has made it clear he is exercising this pocket veto because some of his constituents dared to support a political rival, stating: "***Elections have consequences. You can't expect me to give Audrey Edmonson's group, that has harmed me time and time again, the same resources they've had before***."

62.     NANA relied on Commissioner Hardemon's written and public commitment—made before Jones endorsed Edmonson—that he would introduce the extension resolution and support its approval. In reliance on this commitment, NANA secured more than $7.7 million in pre-development and construction financing from affordable housing lenders and obtained all necessary permits. However, the release of those funds is contingent upon Commission approval of the extension, which would provide NANA with a reasonable timetable to complete the projects. In the meantime, NANA has incurred hundreds of thousands of dollars in costs to safely maintain the vacant lots, obtain key permits which had now lapsed, and now faces the risk of loan default—exposing both the organization and potentially the County to legal and financial liability.

63.     Initially, NANA believed the delay in submitting the resolution might be due to a miscommunication or bureaucratic oversight.  When NANA contacted Commissioner Hardemon's office, they were told that the resolution had been sent to be placed on the agenda for a formal

vote.  However, the Miami-Dade County Commission's office later confirmed that Commissioner Hardemon's office had never submitted the resolution to be placed on the agenda.

64.     The Notice of Default confirmed what had become apparent: Commissioner Hardemon had lulled NANA into relying on his assurances, only to pull the rug out from under them at the most damaging moment because of Jones's support for Hardemon's political rival.

65.     Commissioner Hardemon waited until NANA was burdened with substantial financial obligations before exercising a pocket veto—refusing to advance the resolution for Commission consideration.

66.     Several of Commissioner Hardemon's constituents in District 3 were directly harmed by his unfair tactics.  These were home buyers who applied to purchase a new preconstruction home under the Infill Program on the understanding that the homes would be completed in a reasonable timeframe.  They completed mortgage applications, underwent credit checks, spent time and effort completing rigorous program requirements, and passed on other housing opportunities, only to learn that their dream of owning a new home would not happen.

67.     This conduct was a two-pronged effort both to punish Leroy Jones for his political support of a challenger and to pressure NANA into political compliance going forward.  Simultaneously, it positioned Commissioner Hardemon to potentially reassign the now more valuable multifamily lots to developers of his choosing.

68.     Commissioner Hardemon's actions constitute unlawful retaliation in response to protected political speech and association.

69.     The only "threat" NANA or Leroy Jones has ever made toward Commissioner Hardemon is their stated intent to hold him accountable at the ballot box.

70.     As a result of Commissioner Hardemon's unconstitutional retaliation, NANA has suffered significant financial harm in the amount of hundreds of thousands of dollars.  NANA has had to maintain the lots in an undeveloped state and has expended significant sums of money for maintenance of and carrying costs related to holding the undeveloped properties, has had permits lapse for non-development, faces the risk of harm to its credit and procure further financing, and has suffered reputational harm among its clients and others. More importantly, his actions have directly harmed the low and middle-income residents of District 3—the very individuals who would have benefited from the safe, affordable housing NANA was well-positioned to deliver but for the Commissioner's politically motivated and unconstitutional retaliation.

### COUNT I:
### 42 U.S.C. § 1983 First Amendment Retaliation
### against Hardemon in his Individual Capacity

71.     Plaintiff realleges the above paragraphs.

72.     By supporting Commissioner Edmonson and attending County Commission meetings to urge Commissioner Hardemon to fulfill his campaign promise to provide affordable housing, Plaintiff's leaders, members, and supporters engaged in protected activity under the First Amendment.

73.     Commissioner Hardemon's refusal to place the deed extension resolution on the Commission agenda, along with his efforts to freeze NANA's County funding, constituted adverse actions that caused direct economic harm to Plaintiff.

74.     These actions by Commissioner Hardemon were administrative in nature, specifically targeting NANA—a County contractor—and affecting NANA uniquely as the owner of lots deeded under the Program, rather than the general public.

75.     Commissioner Hardemon's decision not to submit NANA's Program deeds to the County Commission for a vote on an extension was designed to discourage Plaintiff and others from engaging in protected speech by making it clear that political opposition by organizations in his district that did business with the County would result in punishment and economic damage.

76.     Commissioner Hardemon's act of temporarily freezing NANA's funding in response to Muhammad's comments at the commission meeting was designed to discourage Plaintiff and others from engaging in fundamental protected speech: criticism of elected officials, namely, criticism of Hardemon himself.

77.     Commissioner Hardemon's decision to not submit NANA's Program deeds to the County Commission for a vote on an extension in fact damaged NANA economically by making it impossible for NANA to obtain the release of construction financing it had secured to develop the Program lots, the release of which was contingent on NANA obtaining an extension of the completion timetable. Additionally, NANA has incurred hundreds of thousands of dollars in damages related to loan closing costs and land maintenance, and other costs.

78.     Commissioner Hardemon's public statements have made it clear that his decisions to cause economic damage to NANA were motivated by political retribution and a desire to punish Plaintiff for engaging in protected First Amendment activity.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiffs demand the entry of judgment in its favor, actual or compensatory damages against Commissioner Hardemon individually; and because he acted maliciously, wantonly, or oppressively, punitive damages; injunctive relief; declaratory relief; the costs of this action; attorney's fees; and such other and further relief that the Court deems just and equitable.

**COUNT II:**
**42 U.S.C. § 1983 *Monell* First Amendment Retaliation**
**against Miami-Dade County**

79.     Plaintiff realleges paragraphs 1 through 70 above.

80.     Commissioner Hardemon, in his role as the County Commissioner for District 3 of Miami-Dade County, was the chief policymaker on which resolutions affecting county property located in District 3 would be presented for a full vote by the County Commission.

81.     Commissioner Hardemon directly participated in the decision to pocket-veto NANA's extension resolution to punish Jones and NANA's members for engaging in the protected First Amendment activity described above:

82.     Commissioner Hardemon's decision to not submit NANA's Program deeds to the County Commission for a vote on an extension in fact damaged NANA economically by making it impossible for NANA to obtain the release of construction financing it had secured to develop the Program lots, the release of which was contingent on NANA obtaining an extension of the project completion timetable. Additionally, NANA has incurred hundreds of thousands of dollars in damages related to loan closing costs and land maintenance, and other costs.

83.     The direct involvement of Commissioner Hardemon as the chief policymaker was the moving force and a direct and proximate cause of the unconstitutional retaliation against the Plaintiff as well as the injuries and damages sustained by the Plaintiff.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiffs demand the entry of judgment in its favor, actual or compensatory damages against Miami-Dade County; injunctive relief; declaratory relief; the costs of this action; attorney's fees; and such other and further relief that the Court deems just and equitable.

## COUNT III:
### 42 U.S.C. § 1983 Fourteenth Amendment Due Process Violation, against Miami-Dade County

84.     Plaintiff realleges paragraphs 1 through 70 above.

85.     As current holders of the Program deeds contained at Exhibit A, NANA has a protected property interest that it has invested significant time, resources, and debt into improving and developing.

86.     To protect that property interest, NANA must be able to request an extension of the deeds so they can complete development of slated low and middle-income housing, sell the units, recoup costs, and repay the loans they took out to develop the deeded land.

87.     Under Miami-Dade County's practice and policy, NANA's only option is simply to hope that Commissioner Hardemon can be convinced to put the matter up for a vote, otherwise the deeds will be automatically reverted.

88.     This allowed Hardemon, solely by whim and fiat, to exercise his pocket-veto by indefinitely tabling the resolution until the reversion automatically vested to be exercised by the County at its option.

89.     This means NANA has no process to challenge this reversion beyond convincing Hardemon to stop his campaign of punishment and retaliation.

90.     Without the ability to request this resolution be placed to a vote through the other commissioners or by other administrative mechanism, NANA has no process by which it can overcome the decision by Hardemon simply to refuse to put the resolution on for a vote.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands the entry of judgment in its favor, actual or compensatory damages against Miami-Dade County; injunctive relief;

declaratory relief; the costs of this action; attorney's fees; and such other and further relief that
the Court deems just and equitable.

### COUNT IV:
**Fourteenth Amendment Class-of One Equal Protection Violation under 42 U.S.C. §
1983 against Hardemon in his Individual Capacity.**

91.     Plaintiff realleges paragraphs 1 through 70 above.

92.     NANA is similarly situated to other property developers who have been deeded
land by Miami-Dade County.

93.     Those deeds always contain a provision for reversion of the land to the County to
protect from delinquent developers squatting on the land and leaving it underutilized.

94.     Like those other similarly situated developers, NANA expected that if it ran into
difficulties completing its construction projects in sufficient time under the deed, it could request
an extension and present its case to the Commission for a full vote.

95.     NANA is also similarly situated to many other non-profit organizations in that it
relies on grants and other funding from Miami-Dade County to fund its projects and cover its
expenses.

96.     But Commissioner Hardemon has singled NANA out for disparate treatment from
these other organizations both by refusing to place its extension resolution on for a vote, and for
leading a campaign to freeze NANA's funding.

97.     Hardemon's publicly stated motive for doing so is to retaliate against NANA for
its leadership's support of Hardemon's political opponents and its supporters' criticism of him as
a political leader.

98.     There is no rational basis for the disparate treatment NANA is suffering, which
violates the Equal Protection clause of the Fourteenth Amendment.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands the entry of judgment in its favor, actual or compensatory damages against Commissioner Hardemon individually; and because he acted maliciously, wantonly, or oppressively, punitive damages; injunctive relief; declaratory relief; the costs of this action; attorney's fees; and such other and further relief that the Court deems just and equitable.

**COUNT V:**
**42 U.S.C. § 1983 *Monell* Fourteenth Amendment Class-of-One**
**against Miami-Dade County**

99.     Plaintiff realleges paragraphs 1 through 70 above.

100.     Commissioner Hardemon, in his role as the County Commissioner for District 3 of Miami-Dade County was the chief policymaker on which resolutions affecting county property located in District 3 would be presented for a full vote by the County Commission.

101.     Commissioner Hardemon directly participated in the decision to pocket-veto NANA's extension resolution to punish Jones and NANA's members for engaging in the protected First Amendment activity described above.

102.     Commissioner Hardemon's decision not to submit NANA's Program deeds to the County Commission for a vote on an extension in fact damaged NANA economically by making it impossible for NANA to obtain the release of construction financing it had secured to develop the Program lots, the release of which was contingent on NANA obtaining an extension of the completion timetable. Additionally, NANA has incurred hundreds of thousands of dollars in damages related to loan closing costs and land maintenance, and other costs.

103.     The direct involvement of Commissioner Hardemon as the chief policymaker was the moving force and a direct and proximate cause of the unconstitutional retaliation against the Plaintiff as well as the injuries and damages sustained by the Plaintiff.

22

104. Commissioner Hardemon, in his role as County Commissioner for District 3 of Miami-Dade County was the chief policymaker on the decision to lead a vote of the full Commission to freeze the funding of NANA as retaliation for the political speech of citizens he associated with NANA.

105. The Commission did in fact vote to freeze the funding, making it the official policy of the County.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands the entry of judgment in its favor, actual or compensatory damages against Miami-Dade County; injunctive relief; declaratory relief; the costs of this action; attorney's fees; and such other and further relief that the Court deems just and equitable.

**COUNT VI:**
**42 U.S.C. § 1983 (Injunctive Relief)**
**against Both Defendants**

106. Plaintiff realleges paragraphs 1 through 70 above.

107. By supporting Commissioner Edmonson and attending County Commission meetings to urge Commissioner Hardemon to fulfill his campaign promise to provide affordable housing, Plaintiff's leaders and members engaged in protected activity under the First Amendment.

108. Commissioner Hardemon's refusal to place the deed extension resolution on the Commission agenda, along with his efforts to freeze NANA's County funding, constituted adverse actions that caused direct economic harm to Plaintiff.

109. These actions by Commissioner Hardemon were administrative in nature, specifically targeting NANA—a County contractor—and affecting NANA uniquely as the owner of lots deeded under the Program, rather than the general public.

110.    Commissioner Hardemon's decision to not submit NANA's Program deeds to the County Commission for a vote on an extension was designed to discourage Plaintiff and others from engaging in protected speech by making it clear that political opposition by organizations in his district that did business with the County would result in punishment and economic damage.

111.    Commissioner Hardemon's decision not to submit NANA's Program deeds to the County Commission for a vote on an extension in fact damaged NANA economically by making it impossible for NANA to obtain the release of construction financing it had secured to develop the Program lots, the release of which was contingent on NANA obtaining an extension of the completion timetable. Additionally, NANA has incurred hundreds of thousands of dollars in damages related to loan closing costs and land maintenance, and other costs.

112.    Commissioner Hardemon's public statements have made it clear that his decisions to cause economic damage to NANA were motivated by political retribution and a desire to punish Plaintiff for engaging in protected First Amendment activity.

113.    Having received a Notice of Default on February 25, 2025 from Miami-Dade County for failure to obtain a certificate of occupancy for the Program lots and being unable to cure, Plaintiff is fearful that Miami-Dade County will seek to exercise a reversion of lots deeded under the Program.

114.    Plaintiff is entitled to preliminary and permanent injunctive relief against Defendants for violations of Plaintiff's constitutionally-guaranteed rights of free speech, assembly, and petition.

115.    Plaintiff will suffer irreparable harm if the requested preliminary and permanent injunctive relief is not granted, as Defendants' actions violate Plaintiff's constitutionally-guaranteed rights of free speech, assembly, and petition.

116.    The deprivation of Plaintiff's constitutionally-protected rights to free speech, assembly, and petition outweighs any harm the requested preliminary and permanent injunction relief may cause to the Defendants.

117.    The protection of Plaintiff's First Amendment rights of free speech, assembly, and petition are in the public interest.

WHEREFORE, Plaintiff respectfully requests entry of judgment against Defendants enjoining Miami-Dade County from exercising any reversion rights with respect to the Program lot deeds until the Commission has held a vote on the proposed resolution extending the development timetable.

### COUNT VII:
### Promissory Estoppel
### against Commissioner Hardemon in His Official Capacity

118.    Plaintiff realleges paragraphs 1 through 70 above.

119.    On November 28, 2023, Commissioner Hardemon, in his official capacity as District 3 Commissioner, promised NANA that he would introduce a resolution to the Board of County Commissioners that would extend NANA's development timeline on Program lots from January 31, 2024 by one year to January 31, 2025.

120.    NANA, as the owner of the Program lots, relied in good faith on Commissioner Hardemon's promise.

121.    Based on NANA's belief that Commissioner Hardemon would keep his promise, NANA changed its position in reliance by obtaining in excess of $7.7 million in development financing, which it could not use because the release of the money was contingent on Commissioner Hardemon putting the resolution before the County Commission for a vote as

promised, and spending hundreds of thousands of dollars in loan closing costs, land maintenance, and other costs.

122.    However, because Commissioner Hardemon did not introduce the extension resolution as promised, the lenders have refused to release the financing.

123.    NANA has had to maintain the lots in an undeveloped state and has expended significant sums of money for maintenance of and carrying costs related to holding the undeveloped properties, has had permits lapse for non-development, faces the risk of harm to its credit and procure further financing, and has suffered reputational harm among its clients and others.

**WHEREFORE**, Plaintiff demands the entry of judgment in its favor, specific performance, actual or compensatory damages against Commissioner Hardemon in his official capacity; injunctive relief; declaratory relief; the costs of this action; and such other and further relief that the Court deems just and equitable.

**COUNT VIII:**
**Breach of Contract**
**against Commissioner Hardemon in His Official Capacity**
**(Pled in the alternative to COUNT VII)**

124.    Plaintiff realleges paragraphs 1 through 70 above.

125.    The November 28, 2023 letter at Exhibit B was an express written contract between Commissioner Hardemon, in his official capacity as District 3 Commissioner for the County Commission of Miami-Dade County and Plaintiff.

126.    Under the November 28, 2023 letter, Commissioner Hardemon promised to seek from the Miami-Dade County Commission an extension of NANA's deadline to develop Program lots in consideration of NANA agreement to develop those lots for publicly beneficial affordable housing purposes during the extension period.

127.    NANA accepted Commissioner Hardemon's offer as evidenced by, *inter alia*, NANA working with Commissioner Hardemon's staff to draft the proposed resolution that Commissioner Hardemon promised to sponsor.

128.    Further, relying on Commissioner Hardemon's promise, NANA obtained in excess of $7.7 million in construction financing and has expended money to service those obligations. Additionally, NANA has incurred hundreds of thousands of dollars in damages related to loan closing costs and land maintenance, and other costs.

129.    Despite the written express agreement, Commissioner Hardemon did not sponsor the resolution to extend NANA's deadline to develop its Program lots. Commissioner Hardemon's refusal to sponsor the resolution for action by the Miami-Dade County Commission despite his express written agreement to do so is a breach by Defendants of the November 28, 2023 letter agreement.

130.    As a direct and proximate result of Commissioner Hardemon's breach of the November 28, 2023 agreement NANA has suffered damages in the form of lost money and reputational harm.

131.    All conditions precedent to the filing of this action have been satisfied or waived.

**WHEREFORE**, Plaintiff demands the entry of judgment in its favor, specific performance, actual or compensatory damages against Commissioner Hardemon in his official capacity; injunctive relief; declaratory relief; the costs of this action; and such other and further relief that the Court deems just and equitable.

### JURY DEMAND

Plaintiff hereby demands a trial by jury, pursuant to FED. R. CIV. P. 38(b), on all issues so triable.

Dated: June 12, 2025.

Respectfully Submitted,

**RAVINDRAN LAW FIRM, PLLC**
2525 Ponce De Leon Blvd., Suite 300
Coral Gables, FL 33134
Telephone: 305.677.8713

By: *s/Arun G. Ravindran*
Arun G. Ravindran, Esq. (66247)
E-Mail: arun@ravindranlaw.com
James Odell, Esq. (101396)
E-Mail: james@ravindranlaw.com