UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-22659-ALTMAN

**NEIGHBORS AND NEIGHBORS
ASSOCIATION, INC.**,

    *Plaintiff*,

v.

**KEON HARDEMON**, *et al.*,

    *Defendants.*

_____/

## ORDER GRANTING MOTION TO DISMISS

Our Plaintiff sought to extend its deadline to build affordable housing under a county-sponsored program. But it claims that a county commissioner refused to support an extension and attempted instead to freeze its funding—all because the Plaintiff supported a political rival. So, our Plaintiff sued the commissioner and the county under 42 U.S.C. § 1983, asserting First Amendment, Fourteenth Amendment, and breach-of-contract claims. The Defendants now move to dismiss those claims, arguing that the Plaintiff lacks standing, that the commissioner enjoys legislative immunity, and that the Plaintiff fails to state claims against the county. After careful review, we **GRANT** the Defendant's motion.

### THE FACTS

Our Plaintiff—Neighbors and Neighbors Association, Inc. ("NANA")—is a "non-profit organization focused on promoting small business development and affordable housing in historically underserved and economically disadvantaged areas" in Miami-Dade County (the "County"). Complaint [ECF No. 1] ¶ 20. The Plaintiff participates in the County's Infill Housing Program (the "Program"), which aims to "address the affordable housing crisis" by "transfer[ring] surplus County-

owned parcels to both for-profit and nonprofit developers at nominal costs, with the goal of constructing single-family homes and multi-family rental units for low- and middle-income residents." *Id.* ¶¶ 15–16. In 2016, the Plaintiff received thirty-five properties through the Program. *See id.* ¶ 22. But, under the Program, "deeds [are] granted subject to the standard . . . condition that construction be completed within two years for . . . single-family and duplex lots or five years for . . . multifamily projects." *Id.* ¶ 26. During the COVID-19 pandemic, the Plaintiff "encountered significant delays," including "labor shortages and supply chain disruptions." *Id.* ¶ 29.

So, "beginning in August 2022," the Plaintiff sought to "extend the development deadlines for . . . thirty incomplete properties." *Id.* ¶ 35. To do so, it "engaged in a series of communications" with Keon Hardemon, the County Commissioner "representing County Commission District 3," which "encompasses Liberty City, Little Haiti, and Allapattah." *Id.* ¶ 3. "In 2022 and 2023, Commissioner Hardemon agreed to introduce resolutions related to deed extensions and other matters concerning the lots." *Id.* ¶ 36. Once he did, the County Commission "unanimously approved the proposed extensions," *ibid.*, which gave the Plaintiff until January 31, 2024, to complete construction, *see id.* ¶ 37.

In November 2023, our Plaintiff sought another extension. According to the Plaintiff, "Commissioner Hardemon . . . committed in writing to support" that latest extension. *Id.* ¶ 44. But things changed during the "2024 District 3 Commission election," when the Plaintiff supported Audrey Edmonson—Hardemon's "long-standing political rival[ ]"—in her bid to "retake the seat from Commissioner Hardemon." *Id.* ¶¶ 41, 43; *see also ibid.* ("NANA's Executive Director . . . was an outspoken supporter of Edmonson during the campaign—publicly endorsing her, participating in campaign events, speaking on her behalf at community meetings, and routinely criticizing Commissioner Hardemon in various media appearances."). Trying to "exact political revenge," our Plaintiff alleges, Hardemon took two steps to "crippl[e]" the Plaintiff. *Id.* ¶ 58. *First*, he "unreasonably

2

refused to submit the extension resolution to the County Commission." *Id.* ¶ 61. *Second*, at a January 22, 2025 meeting of the County Commissioners, Hardemon "made a series of disparaging remarks about NANA" and "then moved for the immediate suspension of all payments to . . . NANA." *Id.* ¶ 49; *see also ibid.* ("[Hardemon] liken[ed] the organization to a 'gang' and accus[ed] it of engaging in behavior akin to 'terrorism.' He . . . further stated that he did not feel comfortable allocating public funds to individuals who, in his view, were threatening him and his family.").

On February 25, 2025, our Plaintiff received notice that "NANA's Program lots were in default." *Id.* ¶ 59. So, on June 12, 2025, the Plaintiff sued both Hardemon and the County, alleging First Amendment retaliation, due-process violations, equal-protection violations, and a breach of contract. *See id.* ¶¶ 71–131. On August 5, 2025, Hardemon and the County moved to dismiss under Federal Rules of Procedure 12(b)(1) and 12(b)(6), arguing that the Plaintiff "lacks any standing to bring the lawsuit," that Hardemon is entitled to "absolute legislative immunity," and that the Plaintiff "cannot state any viable cause of action under federal or state law." Motion to Dismiss ("MTD") [ECF No. 17].

## THE LAW

A motion challenging subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) may take the form of either a "facial attack" or a "factual attack." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990). "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Gainsburg v. Fla. Bar*, 2024 WL 2976742, at *2 (S.D. Fla. June 13, 2024) (Altman, J.) (cleaned up). And a "factual attack . . . challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008). In considering a factual attack on jurisdiction, "a district court is not limited to an inquiry into undisputed facts; it may

3

hear conflicting evidence and decide for itself the factual issues that determine jurisdiction." *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991).

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Megladon, Inc. v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 (S.D. Fla. 2023) (Altman, J.) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but legal conclusions without adequate factual support are entitled to no assumption of truth." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (cleaned up).

## ANALYSIS

The Defendants move to dismiss on three grounds. *First*, they say that our Plaintiff lacks Article III standing. *Second*, they argue that Hardemon is entitled to legislative immunity. *Third*, they contend that the Plaintiff fails to state claims against Hardemon and the County. We'll address each argument in turn.

### I. Standing

We begin by confirming that our Plaintiff has Article III standing. *See Cobb v. Warden*, 2025 WL 340004, at *2 (11th Cir. Jan. 30, 2025) ("[C]ourts are generally expected to resolve jurisdictional nonmerits grounds for dismissal before nonjurisdictional nonmerits grounds." (quotation marks omitted)). The Defendants argue that the Complaint fails to allege "any injury in fact," "any injury fairly traceable to Defendants," and "what declaration or injunction Plaintiff seeks." MTD at 6–8. Not so.

4

To satisfy the requirements of Article III standing, a plaintiff "must establish that she (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation marks omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

Our Plaintiff meets that standard. *First*, it alleges that the Defendants blocked it from accessing "$7.7 million in construction financing" and caused "hundreds of thousands of dollars in damages related to loan closing costs and land maintenance, and other costs." Complaint ¶ 128. That alone suffices to fulfill the injury-in-fact requirement, at least as it concerns the claims against Hardemon, because "[t]angible harms include . . . financial loss." *Nelson v. Experian Info. Sols. Inc.*, 144 F.4th 1350, 1353 (11th Cir. 2025) (quotation marks omitted); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.").

But the Plaintiff must still identify an injury-in-fact for its claims against the County. And, according to the Complaint, Hardemon "had sole control over whether any further extensions of the development timetable for NANA's thirty Program lots would be put to a vote before the full Commission." Complaint ¶ 33. On that theory, then, the financial harm at issue appears to be Hardemon-specific. Even so, however, the Plaintiff alleges that it received a Notice of Default from the County, which warned that, "unless the homes were constructed and certificates of occupancy issued" by March 25, 2025, "the County could exercise its option to revert the thirty properties." *Id.* ¶ 59. That's enough to allege an injury-in-fact—at least at this early pleading stage of the case.

"When an individual is subject to the threatened enforcement of a law, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (cleaned up); *cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) ("[A]dministrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review."). "[F]uture injuries . . . may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). Here, our Plaintiff has sufficiently alleged facts establishing a substantial risk of impending harm. It notes, for instance, that it has been "unable to construct the homes and obtain certificates of occupancy within the 30-day cure period." Complaint ¶ 59. It indicates that the "deeds" to the lots "automatically revert[ ]" to the County, even if the County hasn't yet "exercise[d] its option to revert the thirty properties." *Id.* ¶¶ 59, 87. And it makes clear that Hardemon previously "stat[ed] his intention to revert the multifamily development lots." *Id.* ¶ 38.

Those facts amount to more than just "a significant degree of guesswork." *Trump v. New York*, 592 U.S. 125, 132 (2020). To the contrary, the Plaintiff has alleged "an actual and well-founded fear that the law will be enforced against them." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). And "[w]here threatened *government* action is concerned, a plaintiff is not required to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 118–19 (2007). We thus conclude that the Plaintiff has alleged a credible threat of reversion sufficient to establish a County-related harm.

*Second*, the Plaintiff satisfies the traceability test. Starting with its claims against Hardemon, the Plaintiff alleges that, "[a]s a result of Commissioner Hardemon's unconstitutional retaliation, NANA has suffered significant financial harm in the amount of hundreds of thousands of dollars." Complaint ¶ 70; *see also* Plaintiff's Response in Opposition to Defendants' MTD (the "Response") [ECF No. 25] at 4–5 ("Hardemon's refusal to put the resolution to a vote, coupled with the audit and threatened

6

freeze on NANA's funding, inflicted a concrete harm."). And, as to its claims against the County, the Plaintiff says that, "[h]aving received a Notice of Default on February 25, 2025 from Miami-Dade County for failure to obtain a certificate of occupancy for the Program lots and being unable to cure, Plaintiff is fearful that Miami-Dade County will seek to exercise a reversion of lots deeded under the Program." *Id.* ¶ 113.

"[T]raceability is not an exacting standard" and requires no more than "*factual* causation between [the plaintiff's] injuries and the defendant's misconduct." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023). So, in alleging that Hardemon's conduct caused it to sustain financial harm and that the County's threat now causes it to fear that the land will revert to the County, our Plaintiff has satisfied the pleading requirements for traceability. *See Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow *indirectly* from the action in question can be said to be 'fairly traceable' to that action for standing purposes." (emphasis added)).

*Finally*, our Plaintiff has met the redressability standard (at least at this early stage of the case). It requests that we "enjoin[ ] Miami-Dade County from exercising any reversion rights with respect to the Program lot deeds until the Commission has held a vote on the proposed resolution extending the development timetable." Complaint ¶ 117; *see also id.* ¶ 4 (explaining that the Plaintiff is "completely unable to access $7.7 million dollars in constructing financing it had previously secured for development of those lots, the release of which was contingent on NANA obtaining an extension of its development rights"). It thus sufficiently pleads that its injury is likely to be redressed by a favorable decision. *See Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018) ("Article III also does not demand that the redress sought by a plaintiff be complete."); *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) ("[T]he effect of the court's judgment on the defendant" must "redress[ ] the plaintiff's injury, whether directly or indirectly." (emphasis omitted)).

7

## II. Claims Against Hardemon

We come out the other way, however, on legislative immunity. The Defendants contend that the "Plaintiff's claims are doomed because Commissioner Hardemon is entitled to absolute legislative immunity." MTD at 2. Our Plaintiff parries that legislative "immunity has no application here." Response at 13. Although we haven't found a case from our Circuit that's on all-fours with ours, we *do* think that legislative immunity shields Hardemon from our Plaintiff's claims.

### a. The Legal Standard

"This country has always recognized the need to protect its national legislators from suit for acts done within the realm of their legislative duties." *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1060 (11th Cir. 1992); *see also S. Ct. of Va v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980) ("[C]ommon-law immunity from liability for . . . legislative acts . . . is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause."). The Supreme Court has thus made clear that "[a]bsolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quotation marks omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 810–11 (1982) ("We have recognized that the . . . legislative functions require absolute immunity."). "[I]n this [C]ircuit, we have extended this immunity to local legislators." *Bryant v. Jones*, 575 F.3d 1281, 1304 (11th Cir. 2009). And the Eleventh Circuit "has extended absolute legislative immunity from suit under 42 U.S.C. § 1983 to purely local legislators in land use and zoning cases." *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1392 (11th Cir. 1993).

Still, "not all actions taken by local legislators are subject to absolute immunity." *Ibid*. "In determining which actions of local legislators are protected by the doctrine of absolute legislative immunity, this Court has drawn the line between legislative actions and administrative actions." *Ibid*. Legislative actions are those that are "considered an integral part of the deliberative and communicative processes by which legislators participate in proceedings with respect to the

consideration and passage or rejection of proposed legislation." *Bryant*, 575 F.3d at 1304–05 (cleaned up). Activities such as "voting, debate and reacting to public opinion are manifestly in furtherance of legislative duties." *DeSisto Coll., Inc. v. Line*, 888 F.2d 755, 765 (11th Cir. 1989). So too are "speech making on the floor of the legislative assembly, preparing committee reports, and participating in committee investigations and proceedings." *Yeldell*, 956 F.2d at 1062 (citations omitted).

"On the other hand, acts such as the public distribution of press releases and newsletters, the acceptance of bribes in return for votes on pending legislative business, the administration of penal facilities, and the denial of licenses, are generally not protected by the doctrine of legislative immunity." *Ibid.* (citations omitted). And that's because those tasks "are not an essential part of the legislative function." *Ibid.*; *see also Bryant*, 575 F.3d at 1306 ("Employment decisions generally are administrative except when they are accomplished through traditional legislative functions such as policymaking and budgetary restructuring that strike at the heart of the legislative process." (quotation marks omitted)). Crucially, then, it's "the official *function* that determines the degree of immunity required, not the *status* of the acting officer." *Espanola Way Corp. v. Meyerson,* 690 F.2d 827, 829 (11th Cir. 1982) (quotation marks omitted).

One exception bears mentioning here. This Circuit has "expressly rejected the argument that the act of voting, in itself, constitutes legislative action giving rise to immunity." *Smith v. Lomax*, 45 F.3d 402, 406 (11th Cir. 1995). "Our cases have recognized that a legislator's vote constitutes the act of 'legislating,' and thus cloaks the legislator with immunity, *if* the vote is cast for or against the enactment of a law." *Id.* at 405 (citations omitted). But the "implementation and execution of a state law and policy" doesn't trigger legislative immunity. *Curling v. Sec'y of Georgia*, 761 F. App'x 927, 934 (11th Cir. 2019). So, "a land use decision by local legislators which is an application of policy to a specific party is not protected by legislative immunity." *Corn*, 997 F.2d at 1392 (quotation marks omitted).

That rule comes from the Eleventh Circuit's decision in *Crymes v. DeKalb Cnty., Ga.*, 923 F.2d 1482 (11th Cir. 1991). The plaintiff in that case sought to operate a waste landfill on her property in DeKalb County, Georgia. So, she applied for approval to her county's Development Department, which rejected her application, demanding that she first donate part of her property to public use. After the county's Board of Commissioners affirmed on administrative appeal, the plaintiff sued under 42 U.S.C. § 1983. As relevant here, the district court found that the defendants were *not* entitled to absolute immunity.

On appeal, the Eleventh Circuit agreed. It explained that the Board of Commissioners' "decision to deny [the] application [wa]s the application of policy to a specific party." *Crymes*, 923 F.2d at 1486. Whereas a "legislative act involves policy-making rather than mere administrative application of existing policies," the *Crymes* Court continued, "[a]cts of zoning enforcement rather than rulemaking are not legislative." *Ibid.* In reaching that decision, the panel relied on two principles. *First*, "[i]f the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative." *Id.* at 1485. *Second*, "if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature." *Ibid.*

### b. Application

Our parties assume opposite sides of the legislative-administrative divide. The Defendants say that Hardemon's actions "fall squarely within . . . his sphere of legislative activity as a sitting and duly elected county commissioner." MTD at 10. As they see it, "refusing to sponsor a resolution for an extension of time before the Board of County Commissioners," and "moving during the January 22, 2025 County Commission meeting to place a temporary hold on future payments to . . . NANA," were "purely legislative acts taken during the legislative process." *Ibid.* Our Plaintiff, by contrast, emphasizes that "[t]he unconstitutional acts alleged here are plainly administrative" because they "singularly focused on NANA . . . and no one else." Response at 12; *see also ibid.* ("These actions were

not levied against any other developer, any other county contractor, or any other non-profit, nor were the acts attendant to broader policymaking such as creating the Infill Program, budget reconciliation, or an inquiry into the government spending.").

This case presents a close call. And that's because it turns on a gray area *Crymes* left underdeveloped: whether an official acts legislatively or administratively when his voting decisions against one party involve a public program. On careful review, though, we conclude that legislative immunity applies here.[1] In reaching that holding, we find the Second Circuit's interpretation of an analogous fact pattern extremely instructive.

In *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177 (2d Cir. 2019), a real-estate developer arranged to work with the City of Buffalo "to build affordable housing on City-owned land" through "a project that would be financed in large part by public grants, loans, and tax exemptions." *Id.* at 183. But, as "the planning phase drew to a close, [the developer] felt pressure from the City to hire an organization sponsored by a political ally of Mayor Byron W. Brown as a contractor." *Ibid.* And, when the developer hired a *different* contractor, the mayor "declined to introduce . . . anticipated resolutions before the Common Council that would have approved a sale of City-owned property" to the developer. *Id.* at 191. For two reasons, the Second Circuit found that the mayor's "discretionary conduct in declining to introduce the necessary resolutions before the Common Council . . . constitute[d] protected legislative activity." *Id.* at 192.

---

[1] In making this determination, we needn't decide whether Hardemon was in fact "motivated by political retribution and a desire to punish Plaintiff." Complaint ¶ 78. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54; *see also Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185, 1192 (11th Cir. 1993) ("[A]ny subjective motivations are irrelevant to absolute legislative immunity."); *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) ("The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good."). What matters, in short, is whether Hardemon acted in a legislative—as opposed to an administrative—capacity, not whether he acted with animus.

11

*First*, the panel observed that the mayor's "actions (or specific inaction, here) seem to us without doubt legislative *in form*." *Ibid.* "Introducing a measure for a vote by a legislative body," the panel explained, "amounts to an integral step in the legislative process, and is therefore a formally legislative act." *Ibid.* (cleaned up). The court therefore found that the "exercise of legislative discretion that legislative immunity is meant to protect surely implies a genuine choice whether or not to perform a given legislative act." *Ibid.* (cleaned up). *Second*, the panel deemed the conduct "legislative in *substance*" because the project at issue involved "a PILOT tax incentive, the transfer of City-owned property, and the allocation of $ 1.6 million in . . . funds." *Id.* at 193. In that context, the panel concluded, the mayor "was not deciding simply whether to seek the Common Council's blessing for a private development project; he was deciding whether a multimillion-dollar housing project, which would use extensive City resources, should proceed at all." *Ibid.*

That analysis fits well here. Like the developer in *NRP*, our Plaintiff worked as an extension of a governmental entity to resolve a city-wide problem. Here, as there, the project at issue affects large-scale municipal resources. What's more, Hardemon and the mayor in *NRP* each took actions that jeopardized the viability of the projects. And those actions each involved, at minimum, a discretionary decision to *decline* to present a resolution.

Our ruling today comports with the principles the Eleventh Circuit articulated in *Crymes*. *First*, *Crymes* instructs us to consider the *type* of decision-making in which the official engaged. Here, it's true, Hardemon acted *pursuant* to county policy. But that doesn't mean he *applied*, *enforced*, or *interpreted* a policy. In declining to put forward an extension vote, and in moving to cut funding, Hardemon engaged in discretionary choices related to the "deliberative and communicative processes by which legislators pass laws." *Yeldell*, 956 F.2d at 1062. Those choices may not have been undertaken in a strictly rulemaking capacity. But they impact how the Program appropriates funds, distributes land, and alleviates a housing crisis. And that means they concern public policy. We thus hesitate to frame

12

Hardemon's actions as administrative, since they're neither *adjudicatory* nor *managerial. See, e.g., ibid.* ("[D]ecisions to hire, fire, and demote certain individuals are . . . administrative acts."); *Smith*, 45 F.3d at 406 ("[The] decision not to reappoint Smith constituted the application of a county policy, expressed in the Fulton County Code, to a specific party . . . [and] was not general in nature."); *Alexander v. Holden*, 66 F.3d 62, 66 (4th Cir. 1995) ("[L]egislator's employment and personnel decisions are generally administrative acts."); *Rinne v. Camden Cnty.*, 140 F.4th 470, 474 (8th Cir. 2025) ("[T]he Commissioners voted to ban Rinne from county property for a year, an act that is administrative, not legislative, in nature."); *Kamplain v. Curry Cnty. Bd. of Comm'rs*, 159 F.3d 1248, 1252 (10th Cir. 1998) ("In voting to censure Plaintiff and prevent him from disrupting future public meetings, the Board members were not voting on, speaking on, or investigating a legislative issue.").

*Second*, *Crymes* tasks courts with considering the *scope* of the relevant decision-making. *See* 923 F.2d at 1485 ("[I]f the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature."). At first blush, this factor appears to tilt in favor of our Plaintiff, given that Hardemon opted against supporting *our Plaintiff's* extension and tried slashing *our Plaintiff's* funds. *Cf. Kelly v. Bd. of Comm'rs, Fulton Cnty.*, 2025 WL 2117809, at *2 (11th Cir. July 29, 2025) (noting that "administrative acts generally impact specific individuals" (cleaned up)). But, in the final analysis, the Plaintiff's approach takes too narrow a view of the Plaintiff's involvement with a public good.

Our Plaintiff's claim concerns not *one* parcel of land, but thirty lots "designated for single-family," "duplex development," and "multifamily development." Complaint ¶ 32. And our Plaintiff isn't just *any* developer: It's "a non-profit community development organization" that's partnered with the County itself. *Id.* ¶ 2; *see also ibid.* ("[NANA] develops surplus county land into safe and affordable single-family and multi-family housing in ground-up construction projects for low and middle-income residents of the Liberty City area and elsewhere in Miami-Dade County."); *id.* ¶ 21 ("NANA has a

13

long-standing relationship with the County and serves as one of its leading grant administration partners. Over the years, NANA has consistently ranked among the County's most successful nonprofit partners in the area of economic development.").

That makes a difference. Tempting as it is to focus on the fact that Hardemon allegedly targeted a *specific* party, his refusal to sponsor the resolution and his attempt to halt funding reverberate far beyond this dispute. And our Plaintiff concedes as much, claiming that the retaliatory acts "have *directly* harmed the low and middle-income residents of District 3—the very individuals who would have benefited from the safe, affordable housing NANA was well-positioned to deliver." *Id.* ¶ 70 (emphasis added); *see also id.* ¶ 66 ("The[r]e were home buyers who applied to purchase a new preconstruction home under the Infill Program on the understanding that the homes would be completed in a reasonable timeframe. They completed mortgage applications, underwent credit checks, spent time and effort completing rigorous program requirements, and passed on other housing opportunities, only to learn that their dream of owning a new home would not happen.").

In that sense, our case more closely resembles *NRP*, not *Crymes*. Hardemon's actions have "a general application," *Brown v. Crawford Cnty., Ga.*, 960 F.2d 1011 (11th Cir. 1992), because they "may have prospective implications that reach well beyond the particular" context at issue here, *Bogan*, 523 U.S. at 56. To decide whether the Plaintiff can build the lots is to decide how best to administer the Program, even if Hardemon wanted to harm *only* our Plaintiff.

Viewed this way, *Crymes* looks a lot like the Northern District of New York's decision in *Anderson Group, LLC v. City of Saratoga Springs*, 557 F. Supp. 2d 332 (N.D.N.Y. 2008)—a case the Second Circuit persuasively distinguished in *NRP*. The district court in *Anderson* held that legislative immunity *didn't* protect city officials who delayed adjudication of a private party's application for a special-use permit on private land. That case, like *Crymes*, concerned a plaintiff "seeking, pursuant to well-established zoning rules, a permit to build homes on its own land using its own money." *NRP*,

14

916 F.3d at 193. As the Second Circuit explained, however, *NRP* (like our case) involved "a joint public-private venture through which the City would expand affordable housing options for its residents by contributing substantial municipal resources." *Ibid.*

But we don't want to leave the impression that our ruling today endorses some butterfly-effect theory of causation. That our Plaintiff builds homes for *others* isn't what clinches our decision. It's that the Plaintiff does so on behalf of the County—while receiving and utilizing County resources for the benefit of the community at large. *See* Complaint ¶ 2 ("As part of its core mission, NANA participates in Miami-Date County's Infill Housing Program."); *id.* ¶ 16 ("If selected, a developer receives the surplus property from the County subject to several conditions and deed restrictions."); *id.* ¶ 19 ("Prospective homebuyers under the Program are also subject to certain eligibility conditions" and "must demonstrate income qualification.").

So, in a different context, our Plaintiff might be right that "[l]egislative immunity does not extend to . . . the processing of a resolution . . . to grant *a single entity* additional time." Response at 1 (emphasis added). Here, however, Hardemon's actions will impact a large swath of Liberty City residents and will shape the operation of a governmental program. That makes them legislative in nature. *See Fowler-Nash v. Dem. Caucus of Pa. House of Reps.*, 469 F.3d 328, 338 (3d Cir. 2006) ("[D]ecisions affecting the community at large are likely legislative."); *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1221 (9th Cir. 1996) ("The decision to demote and to replace [the plaintiff] did not involve the formulation of policy, nor did it apply to the public at large. It therefore was an administrative act.").

In sum, *Cryme* and its progeny require us to find Hardemon immune from suit. This result recognizes that Hardemon's conduct "bore all the hallmarks of traditional legislation" in that it "reflected a discretionary, policymaking decision implicating . . . the city and the services the city provides to its constituents." *Bogan*, 523 U.S. at 55. It complies with the traditional view that "[z]oning and land use decisions by local government officials normally are characterized as a legislative

15

function." *Brown*, 960 F.2d at 1012. And it reflects the reality that "legislative power depends not on . . . form but upon . . . character and effect." *INS v. Chadha*, 462 U.S. 919, 952 (1983) (quotation marks omitted). We therefore dismiss all the Plaintiff's claims against Hardemon.[2]

### III. The Claims Against the County

That leaves the Plaintiff's three claims against the County—two of which are *Monell* claims. *See* Complaint ¶¶ 79–83, 99–105; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). The third alleges that the County violated the Plaintiff's right to procedural due process. *See id.* ¶¶ 84–90. In the Defendants' view, however, "the Complaint's *Monell* claims against the County fail because Commissioner Hardemon does not possess final policy making authority by himself," and the Fourteenth Amendment claim "lacks any allegations to support the deprivation of a protected-property right and a constitutionally inadequate process." MTD at 18–19. We agree.

#### a. *Monell* Liability

"Counties and other municipal entities may be held liable under § 1983 only where action pursuant to official municipal policy of some nature caused a constitutional tort." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1370 (11th Cir. 2024) (quotation marks omitted). "To prove a *Monell* claim, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Teel v. Lozada*, 99 F.4th 1273, 1279 (11th Cir. 2024) (quotation marks omitted). "Absent a formal policy, the plaintiff may satisfy the second element by identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law or a municipal official with final policymaking authority whose

---

[2] The MTD presses alternative arguments for dismissing the claims against Hardemon. *See* MTD at 12–17. Because Hardemon is entitled to legislative immunity, though, we needn't reach those other arguments.

16

decision violated the plaintiff's constitutional rights." *Plowright*, 102 F.4th at 1370 (quotation marks omitted).

Our Plaintiff relies on the final-policymaking approach. It alleges that Hardemon "was the chief policymaker on which resolutions affecting county property located in District 3 would be presented for a full vote by the County Commission." Complaint ¶¶ 80, 99. But the Complaint itself undercuts that theory. The Plaintiff acknowledges that Hardemon's attempt to inflict an "immediate suspension of all payments" was "temporary" and subject to "administrative review." *Id.* ¶¶ 49, 54; *see also id.* ¶ 57 ("Ultimately, as part of the Commission's suspension of NANA's funding, *a review conducted by the Mayor's Office* concluded that NANA was in compliance with all applicable grant program requirements for eighteen of the nineteen grants it held with Miami-Dade County." (emphasis added)); *id.* ¶ 58 ("NANA's funding was not suspended in the end."). And, while the Plaintiff insists that Hardemon exercised "sole control over whether any further extensions of the development timetable for NANA's thirty Program lots would be put to a vote before the full Commission," it explains that "any extension of a lot's development timeline must be approved by a vote of the full Commission." *Id.* ¶¶ 27, 33.[3] We thus cannot find "§ 1983 liability" against the County *both* because Hardemon isn't

---

[3] The parties disagree about whether Hardemon brandished "sole control" over the specific matters that came before the full Commission. *Id.* ¶ 33; *see also* MTD at 14 ("[A]ny County Commissioner, the County Mayor, or even a committee of the County Commission could have sponsored Plaintiff's requested resolution."). We needn't resolve that dispute. "Our task . . . is not to determine who, in fact, wields final policymaking authority but only to consider whether plaintiff has alleged sufficient facts to withstand the . . . motion to dismiss." *Doral 10, LLC v. City of Doral*, 2023 WL 6891270, at *5 (11th Cir. Oct. 19, 2023). And the fact that any extension ultimately required a full-Committee vote is fatal to the Plaintiff's theory. *See Phoenix Ridge GA TC, LP v. City of Atl.*, 2025 WL 831248, at *3 (11th Cir. Mar. 17, 2025) ("[T]he city council's ability to override the mayor's veto for zoning issues meant that the mayor was not the final policymaker for zoning decisions."); *see also Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 638 (11th Cir. 1991) ("[E]ven if an official is vested with final policy-making authority regarding the subject matter in question, not every act of that official will subject the city to liability under section 1983.").

17

the final policymaker *and* because the Plaintiff fails to identify any "acts which the municipality has officially sanctioned or ordered." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016).[4]

### b. Procedural Due Process

Finally, our Plaintiff advances a single non-*Monell* claim against the County. It argues that, as "current holders of the Program deeds," it carries a "protected property interest" and "must be able to request an extension of the deeds . . . [to] complete development of slated low and middle-income housing, sell the units, recoup costs, and repay the loans they took out to develop the deeded land." Complaint ¶ 86. But, under the County's "practice and policy," the Plaintiff insists, the "only option" for securing an extension "is simply to hope that commissioner Hardemon can be convinced to put the matter up for a vote," lest "the deeds . . . automatically revert." *Id.* ¶ 87. Our Plaintiff thus claims that Hardemon's "pocket-veto" leaves it with "no process to challenge th[e] reversion." *Id.* ¶¶ 88–89.

That argument fares no better. "A plaintiff raising a procedural-due-process claim must show (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Howard v. Coonrod*, 134 F.4th 1136, 1149 (11th Cir. 2025) (quotation marks omitted). Our Plaintiff falters at the first step. "Property interests stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts," and "[w]hether these sources create a property interest must be decided by reference to state law." *Arrington v. Helms*, 438 F.3d 1336, 1348 (11th Cir. 2006). The Plaintiff's own description of the Program undermines its property-interest theory. As the Plaintiff explains, the Program allows for "the County to reclaim the property and return it to its inventory" if "a developer fails to meet Program

---

[4] The Plaintiff expresses "fear[ ] that Miami-Dade County will seek to exercise a reversion of lots deeded under the Program," but it hasn't actually alleged that any such reversion has occurred. Complaint ¶ 113. And, while the Plaintiff *could have* alleged that the County's acquiescence in Hardemon's decision not to move for a funding extension constituted the kind of ratification that might give rise to *Monell* liability, it's advanced no such allegation. So, we needn't consider that theory today.

requirements." Complaint ¶ 18. So, having received the surplus property from the County "subject to several conditions and deed restrictions," our Plaintiff cannot now claim a property interest in those lots. *Id.* ¶ 17.

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it" and must instead "have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Our Plaintiff lacks any such right, given that the County never actually transferred full ownership of the property. *See Town of Castle Rock*, 545 U.S. at 756 ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."). This last claim thus likewise fails.

### IV.    Leave to Amend

In the alternative, our Plaintiff requests "leave to amend its Complaint." Response at 21. It does so in a single sentence at the end of its Response—without *any* argument as to how an amended complaint would overcome the problems we've identified in this Order. Still, we "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). So, we grant our Plaintiff leave to amend its Complaint to plead additional facts that might avoid Hardemon's legislative immunity, the County's *Monell* defense, and the property-interest obstacles we've highlighted.

### CONCLUSION

After careful review, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion to Dismiss [ECF No. 17] is **GRANTED**.
2. The Defendants' Motion to Stay [ECF No. 30] is **DENIED as moot**.
3. Counts I–VIII are **DISMISSED without prejudice**.
4. The Plaintiff shall file an amended complaint by **November 19, 2025**.

19

5. All other pending deadlines and hearings are **TERMINATED**. The Clerk shall **CLOSE** this case for administrative purposes. Once the Plaintiff files an amended complaint, either party may move to reopen.

**DONE AND ORDERED** in the Southern District of Florida on November 5, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record