UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-22659-ALTMAN

NEIGHBORS AND NEIGHBORS
ASSOCIATION, INC.,

     *Plaintiff,*

*v.*

KEON HARDEMON, *et al.,*

     *Defendants.*

_____/

## ORDER

Our Plaintiff sought to extend its deadline to build affordable housing under a county-sponsored program. But it alleges that a county commissioner refused to support an extension and attempted instead to freeze its funding—all because the Plaintiff supported a political rival. We previously dismissed this action, finding that the commissioner enjoys legislative immunity and that the Plaintiff failed to state claims against the county. Now that our Plaintiff has amended its complaint, the Defendants move again to dismiss its claims. After careful review, we **GRANT in part** and **DENY in part** the Defendants' motion.

### THE FACTS

Our Plaintiff—Neighbors and Neighbors Association, Inc. ("NANA")—is a "non-profit organization focused on promoting small business development and affordable housing in historically underserved and economically disadvantaged areas" in Miami-Dade County (the "County"). Amended Complaint (the "AC") [ECF No. 1] ¶ 21. It participates in the County's Infill Housing Program (the "Program"), which aims to "address the affordable housing crisis" by "transfer[ring] surplus County-owned parcels to both for-profit and nonprofit developers at nominal costs, with the goal of

constructing single-family homes and multi-family rental units for low- and middle-income residents." *Id.* ¶¶ 15–16. In 2016, the Plaintiff received thirty-five properties through the Program. *See id.* ¶ 24. But, under the Program, "deeds [are] granted subject to the standard . . . condition that construction be completed within two years for . . . single-family and duplex lots or five years for . . . multifamily projects." *Id.* ¶ 28. During the COVID-19 pandemic, the Plaintiff "encountered significant delays," including "labor shortages and supply chain disruptions." *Id.* ¶ 31.

So, "beginning in August 2022," the Plaintiff sought to "extend the development deadlines for . . . thirty incomplete properties." *Id.* ¶ 37. To do so, it "engaged in a series of communications" with Keon Hardemon, the County Commissioner "representing County Commission District 3," which "encompasses Liberty City, Little Haiti, and Allapattah." *Id.* ¶¶ 3, 37. "In 2022 and 2023, Commissioner Hardemon introduced resolutions related to deed extensions and other matters concerning the lots." *Id.* ¶ 38. Once he did, the County Commission "unanimously approved the proposed extensions," *ibid.*, which gave the Plaintiff until January 31, 2024, to complete construction, *see id.* ¶ 39.

In November 2023, our Plaintiff sought another extension. According to the Plaintiff, "Commissioner Hardemon . . . committed in writing to support" that latest extension. *Id.* ¶ 46. But things changed during the "2024 District 3 Commission election," when the Plaintiff supported Audrey Edmonson—Hardemon's "long-standing political rival[ ]"—in her bid to "retake the seat from Commissioner Hardemon." *Id.* ¶¶ 43, 45; *see also id.* ¶¶ 43, 45 ("NANA's Executive Director, Leroy Jones[,] . . . was an outspoken supporter of Edmonson during the campaign—publicly endorsing her, participating in campaign events, speaking on her behalf at community meetings, and routinely criticizing Commissioner Hardemon in various media appearances."). Trying to "exact political revenge," our Plaintiff alleges, Hardemon took two steps to "crippl[e]" the Plaintiff. *Id.* ¶ 62. *First*, he "unreasonably refused to submit the extension resolution to the County Commission." *Id.*

¶ 69. *Second*, at a January 22, 2025 meeting of the County Commissioners, Hardemon "made a series of disparaging remarks about NANA" and "then moved for the immediate suspension of all payments to . . . NANA." *Id.* ¶ 52; *see also ibid.* ("[Hardemon] liken[ed] the organization to a 'gang' and accus[ed] it of engaging in behavior akin to 'terrorism.' He . . . further stated that he did not feel comfortable allocating public funds to individuals who, in his view, were threatening him and his family."). "On Hardemon's motion, the County Commission voted to suspend NANA's county funding pending a compliance audit." *Id.* ¶ 86. "Ultimately, as a part of the Commission's suspension of NANA's funding, a review conducted by the Mayor's Office concluded that NANA was in compliance with all applicable grant program requirements for eighteen of the nineteen grants it held with Miami-Dade County." *Id.* ¶ 61. "The sole exception to NANA's compliance was the Infill Program"—with which it was not in compliance, we're told, "only because of Commissioner Hardemon's unwillingness to bring an extension resolution to the County Commission." *Ibid.*; *see also id.* ¶ 58–59 ("While the freeze ended up being temporary, it damaged NANA, as it required the diversion of staff resources to deal with the looming crisis. NANA's board had to hold up multiple meetings to develop plans and strategies for what would happen if the freeze was made permanent, exploring loans and alternative sources of funding to keep the organization afloat.").

On February 25, 2025, our Plaintiff received notice that "NANA's Program lots were in default." *Id.* ¶ 63. According to the Plaintiff, that notice warned that "unless the default was cured in 30 days . . . , the County could exercise its option to revert the thirty properties[.]" *Ibid.* "On October 21, 2025, the County Mayor presented a quarterly report on County property conveyances" in which the "County administrative staff recommended that the County Commission should take final action to revert all thirty of NANA's program lots by voting on deed reversions." *Id.* ¶ 64.[1]

---

[1] The Defendants contend that the AC "is clear that the County has not reverted the deeds," Motion to Dismiss [ECF No. 43] at 20 n.9, and the Plaintiff never argues otherwise.

In June 2025, the Plaintiff sued both Hardemon and the County (collectively, the "Defendants"), alleging First Amendment retaliation, due-process violations, equal-protection violations, and a breach of contract. *See* Complaint [ECF No. 1]. In November 2025, we granted the Defendants' Motion to Dismiss [ECF No. 17], finding that legislative immunity shielded Hardemon from suit, that the Plaintiff failed to establish *Monell* liability, and that the Plaintiff failed to state a procedural-due-process claim against the County. *See* Order Granting Motion to Dismiss (the "Order") [ECF No. 39]. But we gave the Plaintiff leave to amend. *See id.* at 19.

In December 2025, the Plaintiff filed the operative AC, adding factual allegations to its previous claims against the Defendants. That same month, the Defendants filed a renewed Motion to Dismiss (the "MTD") [ECF No. 43].[2] This Order follows.

## THE LAW

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Megladon, Inc. v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 (S.D. Fla. 2023) (Altman, J.) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but legal conclusions without adequate factual support are entitled to no assumption of truth." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (cleaned up).

---

[2] That MTD is now ripe for adjudication. *See* Response in Opposition to the MTD (the "Response") [ECF No. 47]; Reply in Support of the MTD (the "Reply") [ECF No. 50].

4

**ANALYSIS**

The Defendants again move to dismiss on two main grounds. *First*, they say that Hardemon is entitled to legislative immunity. *Second*, they maintain that the Plaintiff fails to state claims against the County. We address those arguments in turn.[3]

### I.    The Claims Against Hardemon

We previously found that "legislative immunity shields Hardemon from our Plaintiff's claims." Order at 8; *see also id.* at 12 ("In declining to put forward an extension vote, and in moving to cut funding, Hardemon engaged in discretionary choices related to the deliberative and communicative processes by which legislators pass laws. Those choices may not have been undertaken in a strictly rulemaking capacity. But they impact how the Program appropriates funds, distributes land, and alleviates a housing crisis. And that means they concern public policy." (cleaned up)).

Our Plaintiff now offers three new allegations to "clarif[y] why Hardemon's role . . . was administrative rather than policymaking." Response at 3. *First*, it alleges that, "[i]f a lot is reverted to County inventory, it is simply allocated to another Infill Program participant who desires to develop it." AC ¶ 19. *Second*, the Plaintiff claims that any reversion "will be insignificant" in relation to "public policy and the ongoing housing crisis," since NANA has only "29" of the "1438 parcels deeded under the Infill Program"—"a mere 2% of the total program lots and 3.9% of the 737 lots located in District 3." *Id.* ¶ 65. *Third*, it alleges that, "[u]pon reversion, these lots will be distributed to another developer who will have at least two years under Program guidelines to develop the properties into affordable housing," and that "the identity of the developer is an administrative decision with no policy impact." *Id.* ¶ 66; *see also id.* ¶ 92 ("Hardemon's actions were not legislative in nature in that they had no

---

[3] Our Order opened by "confirming that our Plaintiff has Article III standing." Order at 4. The latest MTD doesn't challenge that holding, and we see no reason to revisit this issue here. *See id.* at 4–7.

appreciable impact on public policy or involve typical legislative priorities such as budgeting or policy making. Nor did they, or will they, have a significant impact on a meaningful number of Hardemon's District 3 constituents.").

Taken together, our Plaintiff believes that these allegations do two things. *One*, by "highlight[ing] that, if NANA's Program lots are reverted, the lots will remain part of the Infill Housing Program inventory because they will remain earmarked for development of low-income housing," the Plaintiff says, the AC "establish[es] that the process is an administrative distribution of resources that have already been allocated." Response at 4; *see also ibid.* ("If reverted from NANA, another Infill Program participant who desires to develop it will be allocated the lots to develop the low-income housing on them." (quotation marks omitted)). *Two*, by making "clearer by the numbers that Hardemon's and the County's actions in forcing the reversion do not have broad-ranging policy implications for affordable housing in Miami-Dade County," the Plaintiff believes, the AC reveals that Hardemon engaged in "a surgical strike designed to cripple NANA, as opposed to a shift in policy or legislative goals with respect to low-income housing." *Id.* at 3–4.

We remain unpersuaded. That the County may eventually redistribute NANA's lots to another developer doesn't change the fact that "Hardemon's actions will impact a large swath of Liberty City residents and will shape the operation of a governmental program." Order at 15. The AC in fact concedes that a reversion *will* "affect[ ] the community at large," *ibid.* (quoting *Fowler-Nash v. Dem. Caucus of Pa. House of Reps.*, 469 F.3d 328, 338 (3d Cir. 2006)), because, "as a matter of policy[,] those low- and middle-income residents of District 3 who qualify for the Program will still be waiting for those lots to be developed," AC ¶ 66. And the mere fact that NANA's properties represent only 3.9% of District 3 lots doesn't negate the reality that this action "concerns not one parcel of land, but *thirty* lots designated for single-family, duplex development, and multifamily development." Order at 13 (quotation marks omitted & emphasis added). Indeed, nothing in our Order imposed a numerical

threshold for measuring the impact of a "joint public-private venture through which [a] City . . . expand[s] affordable housing options for its residents by contributing substantial municipal resources." *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 193 (2d Cir. 2019). We thus agree with the Defendants that the AC "does not add any facts that materially alter the Court's legislative immunity ruling." MTD at 7.

Our prior legislative-immunity finding focused on the fact that the Plaintiff "worked as an extension of a governmental entity to resolve a city-wide problem," that "the project at issue affects large-scale municipal resources," and that Hardemon took actions that "jeopardized the viability of the project[ ]." Order at 12. Those factors remain true today, notwithstanding the new allegations we've highlighted above. So, even if the Plaintiff's lots comprise a fraction of the total Program deeds—and even if those lots end up being built out by someone else—Hardemon's actions, as the AC acknowledges, *still* inflict a substantially similar "harm[ ]" on the "constituents in District 3." AC ¶ 74. After all, another developer "will have at least two years . . . to develop the properties into affordable housing," all while "low- and middle-income residents . . . wait[ ] for those lots to be developed." *Id.* ¶ 66; *see also id.* ¶ 51 (quoting Jones's speech to the Commission explaining that "this is unfair . . . [to] people [whose] credit is on the line [and who] cannot move in their house because we're waiting on an extension so they can complete their houses").

On the record before us, then, the animating principle of our prior Order applies with equal force today: "Hardemon engaged in discretionary choices" that "impact[ed] how the Program appropriates funds, distributes land, and alleviates a housing crisis." *Ibid.* The new allegations fail to change that reality. And the AC's insistence that Hardemon played only an "administrative" role, AC ¶ 134, amounts to a legal conclusion we're not bound to accept, *see Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or

7

legal conclusions masquerading as facts will not prevent dismissal."). We therefore—once again—dismiss all claims against Hardemon.

## II.      The Claims Against the County

That leaves only the Plaintiff's claims against the County. Two such counts—Counts II and V—assert *Monell* claims for First and Fourteenth Amendment violations. *See* AC ¶¶ 97–107, 124–130; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Another—Count III—advances a procedural-due-process claim. *See id.* ¶¶ 108–115. And a fourth—Count VI—seeks "[i]njunctive [r]elief" against both Defendants. *See id.* ¶¶ 131–144. Our prior Order found *both* that the Plaintiff had failed to overcome the *Monell* hurdle *and* that it hadn't sufficiently pled a procedural-due-process claim. *See* Order at 16–20. Our Plaintiff now adds new allegations that (it believes) "cure" any such "deficiencies." Response at 5. We agree, except as to Count VI.

### a.   *Monell* Liability

"Under the *Monell* line of cases, a municipality does not incur Section 1983 liability solely because of its employer-employee relationship with an alleged wrongdoer." *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1285 (11th Cir. 2025). *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692–94 (1978). Instead, "a municipality may be held liable only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1263 (11th Cir. 2010) (cleaned up). "A plaintiff can establish municipal liability under *Monell* in three ways: (1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Tundidor v. Hernandez*, 2026 WL 1800959, at *4 (S.D. Fla. June 23, 2026) (Altman, J.) (quotation marks omitted).

8

We previously rejected the Plaintiff's final-policymaking approach, finding that "the Complaint itself . . . acknowledges that Hardemon's attempt to inflict an immediate suspension of all payments was temporary and subject to administrative review," and that "any extension of a lot's development timeline must be approved by a vote of the full Commission." Order at 17 (quotation marks omitted). In this latest iteration, our Plaintiff recycles that theory—along with the same allegations. That final-policymaker argument thus falters for the same reasons we've already outlined. *See* MTD at 17 (noting that the AC "still concedes that any extension of the lot's development timeline must be approved by a vote of the full Commission" (cleaned up)).

But that's not the end of our inquiry. Our Plaintiff now offers a *second* theory of *Monell* liability—one based on ratification. *See* AC ¶ 107 ("The County's acquiescence to Hardemon's decision to not allow for the funding extension, and their actual implementation of his retaliatory freeze and audit, constitute ratification of his position as the official policy and practice of the County."). The Defendants contest this new theory, arguing that the AC "fails to allege that the County Commission itself—as the entity vested with the policymaking authority for the County—acted with any unconstitutional motive[.]" MTD at 18. The Plaintiff counters that its new allegations "show that the County acquiesced in Hardemon's decision, and . . . allowed Hardemon to serve as the de facto final policy maker on whether NANA should be given an extension." Response at 6.

"[A] municipality can be held liable on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (quotation marks omitted). "When plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's

basis before a court can hold the government liable on a ratification theory." *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (cleaned up).

At this early stage of the case, the AC does just enough to clear this hurdle. It offers six allegations to support its claim that the "County Commission and individual Commissioners were aware of, and acquiesced in, Commissioner Hardemon's unlawful conduct." AC ¶ 83. *First*, it says that "Hardemon has publicly expressed animus toward NANA." *Id.* ¶ 84. *Second*, it alleges that "NANA contacted the Chair's office directly and submitted the draft resolution," only for the "Chair's office [to] inform[ ] NANA that the resolution would not be added to the agenda unless it was transmitted by Commissioner Hardemon himself." *Ibid. Third*, it claims that "Jones addressed a quorum of the Commission and specifically called out Hardemon's refusal to present the extension resolution." *Id.* ¶ 85. *Fourth*, it avers that the "County subsequently notified NANA in February 2025 that it was in default, issued an October 2025 staff analysis recommending reversion of the properties, and assessed tens of thousands of dollars in citations related to NANA's unfinished construction sites." *Ibid. Fifth*, it contends that "a quorum of the County Commission also witnessed Hardemon's extended denunciation of NANA" at the "January 22, 2025 meeting"—and that, "[o]n Hardemon's motion, the County Commission voted to suspend NANA's county funding pending a compliance audit." *Id.* ¶ 86. And *sixth*, it asserts that "NANA has met with the Commissioners of Districts 6, 12, 13, the staffs of the Commissioners for Districts 1 and 5, and the County Mayor in an attempt to get them to place the extension resolution for a vote," only to "be[ ] told that if the matter is going to be placed on the agenda, it has to come from Hardemon." *Id.* ¶ 87.

Drawing all reasonable inferences in favor of the Plaintiff, we think those allegations suffice to sustain a claim of *Monell* liability. Taken together, the six allegations indicate that the County knew about and approved of Hardemon's refusal to platform the resolution for an extension vote—and that it did so despite knowing about his (supposedly) animus-based rationale. It's therefore *plausible* to

believe that, in declining to push the resolution to a vote, the County—through its Commissioners—assumed responsibility for Hardemon's actions by failing to intervene.

The Defendants contend that, "although Plaintiff[ ] allege[s] that the County Commission heard Commissioner Hardemon's comments at the January 25, 2025 meeting, there are no allegations that Plaintiff[ ] made the County Commission aware of any improper motivations by Commissioner Hardemon." Reply at 10. That argument may carry the day later in this case. But our task today is to draw all reasonable inferences in favor of the Plaintiff—not to engage in a hyper-literalistic reading of the AC. And, applying that standard, we think the Plaintiff has done enough to suggest that the Commission was indeed aware of Hardemon's allegedly unlawful motive—especially given the Plaintiff's allegation that Hardemon "publicly expressed animus toward NANA," that NANA "contacted the Chair's office directly" seeking to circumvent Hardemon, that "a quorum of the County Commission also witnessed Hardemon's extended denunciation of NANA," and that Jones "addressed a quorum of the Commission and specifically called out Hardemon's refusal to present the extension resolution." AC ¶¶ 84–86.

Finally, the Defendants point out that "there are a plethora of reasons that could justify the Commission's vote, including Plaintiff's noncompliance with the requirements of the Infill Program." MTD at 17. True enough. But, at this stage of the case, the Plaintiff need only identify *one* viable reason for the Commission's decision to freeze funding and order an audit. Since the AC plausibly alleges that the Commission made that decision with animus against the Plaintiff, it's done enough to plead a ratification theory under *Monell*.[4]

---

[4] The Defendants challenge Counts II and V only on *Monell* grounds. Because they never argue in the alternative that those counts fail to state a claim, we've no need to examine the merits of those counts.

### b. Procedural Due Process

We turn next to Count III, which asserts a procedural-due-process claim. *See* AC ¶¶ 108–115. We dismissed this claim the last time around because the Plaintiff conceded that the Program allows the County "to reclaim the property and return it to its inventory if a developer fails to meet Program requirements." Order at 18–19 (quotation marks omitted). The Plaintiff now tries bolstering its allegations by claiming that "NANA has commenced construction on eight Program lots which include the addition of affixed structures such as footers, foundational slabs, and stem walls, the installation of 'rough in' plumbing and electrical pathways, and the addition of fill and wire mesh." AC ¶ 110. "These fixtures and material improvements," the AC adds, "are property that belongs to NANA which it caused to be added to the deeded lots for the purpose of developing them into low- and middle-income housing under the Program." *Ibid.* The AC further asserts that, "[b]ecause the property exists in a state of limbo, with NANA still responsible as owners of the lots but unable to develop them due to the imminent threat of reverter, NANA has suffered and continues to suffer financial harm," since "NANA must expend funds to maintain the lots and to protect them from trespassers or other nuisances and has incurred tens of thousands of dollars in citations because the lots remain undeveloped." *Id.* ¶¶ 79–80.

The Defendants believe the AC "fares no better than the Initial Complaint because it still maintains that the developers 'receive surplus property from the County subject to several conditions and deed restrictions' and that the Infill Program allows for 'the County to reclaim the property and return it to its inventory' if a 'developer fails to meet Program requirements.'" MTD at 19 (citations omitted). Any "additional description regarding Plaintiff's construction progress," they insist, "is insufficient to overcome the property-interest obstacle previously highlighted by the Court" because, "[u]nder Florida law, such improvements to real property . . . become part of the real property." *Ibid.* In any event, the Defendants continue, "the process Plaintiff challenges is a legislative act that serves

as a condition precedent to another purely legislative act (granting or denying an extension of time) by the full Board," so the Plaintiff "is not entitled to any additional due process beyond what the legislative process itself affords because Plaintiff is effectively asking for a legislative outcome." *Id.* at 20; *see also id.* at 20 n.9 ("[T]he County's Notice of Default allowed Plaintiff 30 days to cure any default. Yet, Plaintiff has not alleged that it has taken any remedial action since the Notice of Default was issued." (citation omitted)).

Our Plaintiff parries that the AC now makes clear that the "property right at issue" *isn't* "just the right to get an extension" but "NANA's own money and the improvements made to the lots." Response at 19. It argues that, as "the unintended warden of a portfolio of semi-developed or undeveloped properties," it is "responsible for paying upkeep costs on the lots," and yet it "can't just pack up the improvements and take them home" because "the improvements of the lots are part and parcel now and will if reverted run with the land." *Ibid.* And it contends that any process the Defendants identify is "entirely illusory": Because "Hardemon is the only one who can put the extension resolution up for a vote," our Plaintiff claims, it "does not have the ability to cure the[ ] default, to seek an extension, or to challenge Hardemon's decision to exercise his pocket veto powers." *Id.* at 20 (quotation marks omitted).

We needn't consider whether "expend[ing] resources and improv[ing] the lots," Response at 19, overcomes the fact that "the County never actually transferred full ownership of the property," Order at 19. And that's because the AC adequately pleads a deprivation of property based solely on the allegation that the Plaintiff "has incurred tens of thousands of dollars in citations because the lots remain undeveloped." AC ¶ 80; *see also id.* ¶ 85 (alleging that the Plaintiff was "assessed tens of thousands of dollars in citations related to NANA's unfinished construction sites"). The Eleventh Circuit has explained that the "issuance of a citation and fine" suffices for a claim asserting "a deprivation of property resulting from state action." *Kupke v. Orange Cnty.*, 293 F. App'x 695, 698 (11th

13

Cir. 2008); *see also Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1327 (11th Cir. 2023) ("[O]ur precedents establish that a due-process right attaches to the imposition of civil or administrative penalties."). And the AC does enough to plead inadequate process by claiming that Hardemon's "pocket veto" left the Plaintiff "with no hearing, no ability to advocate on its own behalf to the government officials that could grant it relief, and no ability to have the decision of Hardemon to bar the doors to the Commission Chamber reviewed on any level." Response at 20.

To withstand summary judgment, of course, our Plaintiff will need to produce viable evidence establishing (among other things) that it *paid*—and lacks sufficient state-law avenues to challenge—those fines. But not today. In plausibly alleging that it "incurred" those "assessments" and that the process available to it under Florida law leaves it stuck within "a state of limbo," AC ¶ 79–80, the Plaintiff has done enough to survive the MTD.

### c.  Injunctive Relief

We turn finally to Count VI, which is titled "42 U.S.C. § 1983 (Injunctive Relief)" and is brought against both Defendants. *See* AC ¶¶ 131–144. Count VI alleges that the "Plaintiff is entitled to preliminary and permanent injunctive relief against Defendants for violations of Plaintiff's constitutionally-guaranteed rights of free speech, assembly, and petition." *Id.* ¶ 140. And it "specifically seeks an injunction which enjoins Miami-Dade County from exercising any reversion rights with respect to the Program lot deeds until the Commission has held a vote on the proposed resolution extending the development timetable." *Id.* ¶ 144. The Defendants argue that "Count VI must be dismissed" because "[i]njunctive relief . . . is a remedy, not a separate cause of action." MTD at 14 (quotation marks omitted). We agree.

"It goes without saying that an injunction is an equitable remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). The Eleventh Circuit has therefore explained that "[t]here is no such thing as a suit for a traditional injunction in the abstract." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097

14

(11th Cir. 2004). Based on its title and substance, however, Count VI appears to allege a cause of action for injunctive relief. It thus fails to state a claim.

Resisting this conclusion, the Plaintiff argues that "Count VI plainly pleads a claim for First Amendment Retaliation under § 1983[.]" Response at 15. But that argument, as the Defendants point out, "is directly contradicted by the title of Count VI[.]" Reply at 8. In any event, to the extent the Plaintiff is trying through Count VI to assert a claim of First Amendment retaliation, that count is simply "duplicative" of Counts I and II, "which already request 'injunctive relief.'" *Ibid.* We'll therefore dismiss Count VI.

### III.  Leave to Amend

Our prior Order noted that the Plaintiff had requested leave to amend only through "a single sentence at the end of its Response—without *any* argument as to how an amended complaint would overcome the problems we've identified[.]" Order at 19. We nevertheless gave our Plaintiff another chance to plead additional facts. *See ibid.* Now, however, our Plaintiff commits that very same mistake again, punctuating its Response with another cursory, one-sentence request for leave to amend. *See* Response at 20 ("Should the Court determine that Plaintiff has failed to state a claim as to any of the Amended Complaint's counts, Plaintiff respectfully requests leave to file a Second Amended Complaint."). We decline to extend the same courtesy this time around.

The Eleventh Circuit has made clear that "filing a motion is the proper method to request leave to amend a complaint"—and that a proper motion to amend "should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (cleaned up). So, "where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1277 (11th Cir. 2018) (cleaned up); *see also Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1298 (11th Cir. 2025) ("The only place

that [Plaintiff] requested leave to amend was on the last page of his response in opposition to the defendants' motions to dismiss," so "it had no legal effect." (cleaned up)).

Our Plaintiff disregarded those requirements. And we've already warned it about shortcutting the leave-to-amend process. We won't be saving the Plaintiff from itself again. *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte[.]").

### CONCLUSION

After careful review, therefore, we **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion to Dismiss [ECF No. 43] is **GRANTED in part** and **DENIED in part**.

    a. Counts I, IV, VI, VII, and VIII are **DISMISSED with prejudice**.

2. The parties shall file an updated joint scheduling report, as required by S.D. FLA. L.R. 16.1(b)(2), by **August 4, 2026.**

**DONE AND ORDERED** in the Southern District of Florida on July 20, 2026.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

16