**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-22659-ALTMAN**

**NEIGHBORS AND NEIGHBORS ASSOCIATION, INC.**,

*Plaintiff*,

*v.*

**MIAMI-DADE COUNTY**,

*Defendant*.

_______________________________________/

# ORDER

In July 2026, we granted in part and denied in part the Motion to Dismiss the Amended Complaint (the "MTD") [ECF No. 43]. *See* MTD Order [ECF No. 51]. The Defendant—Miami-Dade County[1]—now asks, "under Federal Rule of Civil Procedure 54(b)," that we reconsider two aspects of our MTD Order, contending that the "claims against the County for First Amendment Retaliation (Count II) and Fourteenth Amendment equal protection violation (Count V) should not have been allowed to survive[.]" Motion for Reconsideration (the "Motion") [ECF No. 60] at 1, 5; *see also* Amended Complaint (the "AC") [ECF No. 42]. After careful review, we **DENY** the Motion.

## THE LAW

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and

[1] Both the Complaint [ECF No. 1] and the Amended Complaint [ECF No. 42] named *two* Defendants: the County and Keon Hardemon. Our most recent MTD Order—like our original Order Granting the MTD [ECF No. 39]—found that legislative immunity shields Hardemon from the Plaintiff's claims. So, the County is now the sole Defendant in the action.

all the parties' rights and liabilities." FED. R. CIV. P. 54(b). "While Rule 54(b) doesn't specify a standard by which courts must evaluate a motion for reconsideration, the Eleventh Circuit has suggested that 'Rule 54(b) takes after Rule 60(b).'" *ZAGG Inc. v. DVG Trade LLC*, 2026 WL 799303, at *1 (S.D. Fla. Mar. 23, 2026) (Altman, J.) (quoting *Herman v. Hartford Life & Accident Ins. Co.*, 508 F. App'x 923, 927 n.1 (11th Cir. 2013)). "Relief from judgment under Rule 60(b)(6)—and thus reconsideration under Rule 54(b)—is an extraordinary remedy" that "requires showing extraordinary circumstances." *Ibid.* (cleaned up). "The only grounds for granting a motion for reconsideration are newly-discovered evidence or manifest errors of law or fact." *Smith v. Ocwen Fin.*, 488 F. App'x 426, 428 (11th Cir. 2012). "A motion for reconsideration cannot be used to relitigate old matters, raise arguments, or present evidence that could have been raised prior to the entry of judgment." *Ibid.*

## ANALYSIS

The Motion advances three arguments. As to our finding that the AC's "allegations suffice to sustain a claim of *Monell* liability," MTD Order at 10, the Defendant argues in the main that the AC "cannot plausibly allege that the County ratified an unconstitutional decision by Commissioner Hardemon when no claims against Commissioner Hardemon remain due to legislative immunity," Motion at 2–3. In the alternative, the Defendant insists that "the Court should still reconsider its finding that the [AC] plausibly alleged that the County ratified the unconstitutional *basis* (or motive) for that decision." Motion at 2. And as to our finding that the Plaintiff's procedural-due-process claim "do[es] enough to survive the MTD," MTD Order at 14, the Defendant contends that we "relied on cases dealing with adjudicative or administrative action when this case deals with legislative action—a distinction that makes a legal difference," Motion at 3. We reject those challenges in turn.

### I. The *Monell* Challenge

The AC asserts two *Monell* claims—under the First Amendment (Count II) and the Fourteenth Amendment (Count V)—against the Defendant. *See* AC ¶¶ 97–107, 124–130; *see also Monell v. Dep't of*

*Soc. Servs.*, 436 U.S. 658, 691 (1978). Our MTD Order rejected the Plaintiff's attempt to press a final-policymaking theory of *Monell* liability for those counts. *See* MTD Order at 9 ("We previously rejected the Plaintiff's final-policymaking approach . . . . In this latest iteration, our Plaintiff recycles that theory—along with the same allegations. That . . . argument falters for the same reasons we've already outlined."). But it found that the Plaintiff's ratification-based theory of *Monell* sufficed. *See id.* at 10. The Defendant now challenges that finding on two grounds. Neither prevails.

**a. The Immunity Argument**

The Defendant opens by arguing that the "Plaintiff should not have been allowed to proceed on derivative *Monell* claims against the County when the underlying decision the County allegedly ratified (i.e., Hardemon's refusal to platform the resolution for an extension vote) was held insufficient to establish a constitutional claim." Motion at 6 (cleaned up). To that end, the Defendant explains that, "[i]n the Eleventh Circuit, it is well-established that when there is no underlying constitutional violation, a plaintiff's municipality (*Monell*) claim fails as a matter of law, even at the motion to dismiss stage." *Ibid.* So, as the Defendant sees it, "the Court's dismissal of the claims against Commissioner Hardemon . . . should also doom Plaintiff's derivative *Monell* claims against the County because, if there is no unconstitutional action by Commissioner Hardemon, then the Amended Complaint is left without any unconstitutional acts for the County to ratify." *Id.* at 7.

We disagree. The proposition on which the Defendant relies—as the cases the Defendant cites made clear—establishes only that "[t]here can be no . . . supervisory liability when there is no underlying constitutional violation." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." (cleaned up)). From that uncontroversial proposition, however, the Defendant tries to extract a novel

rule: A *Monell* claim isn't viable, the Defendant insists, when a separate claim against an officer fails not on the *merits* but because of *immunity*. We see no basis for that rule, which overlooks (among other things) that "*Monell* . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government." *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985).

The Second Circuit's decision in *Askins v. Doe No. 1*, 727 F.3d 248 (2d Cir. 2013), is instructive. In that case, a plaintiff sued police officers and New York City itself. Having found that the claims against the officers were "either time-barred or barred by the doctrine of qualified immunity," the district court found that "no *Monell* claim lies against the City" because "it cannot be said that any allegedly illegal City policy caused [the] [p]laintiff a constitutional remediable injury[.]" *Askins v. City of New York*, 2012 WL 12884363, at *9 (S.D.N.Y. Feb. 14, 2012). On appeal, the Second Circuit vacated the district court's *Monell* holding, explaining that it "reflects a misunderstanding of the relationship between the liability of individual actors and municipal liability for purposes of *Monell*." *Askins*, 727 F.3d at 253.

The Second Circuit began with a simple proposition: Plaintiffs needn't "obtain a *judgment* against . . . individual tortfeasors in order to establish the liability of [a] municipality"—and indeed "need not sue the individual tortfeasors at all[.]" *Ibid.* So, the panel continued, "the entitlement of . . . individual municipal actors to qualified immunity . . . is . . . irrelevant to the liability of [a] municipality." *Id.* at 254. And while *Askins* recognized that a "failure to secure a judgment against . . . individual actors would, indeed, preclude a judgment against [a] municipality *if* the ruling in favor of the individual defendants resulted from the plaintiff's failure to show that they committed the alleged tort," it concluded that an individual's *immunity* "has no bearing on the liability of municipalities." *Id.* at 253–54; *see also id.* at 254 ("To rule, as the district court did, that the City of New York escapes liability for the tortious conduct of its police officers because the individual officers are

entitled to qualified immunity would effectively extend the defense of qualified immunity to municipalities, contravening the Supreme Court's holding[s].").

The Defendant's argument suffers from the same misconception *Askins* rejected. In holding that legislative immunity protected Hardemon, we found only that the Plaintiff's claims against Hardemon cannot proceed—but passed no judgment on the *merits* of those claims. *See Mitchell v. Forsyth*, 472 U.S. 511, 527–28 (1985) ("[A] claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated."). Contrary to the Defendant's framing, we *never* found that the Plaintiff failed to allege an underlying constitutional injury.

The Defendant invokes two out-of-Circuit district-court cases—one from the Eastern District of Pennsylvania, another from the District of Maryland—that (in its view) support the *Monell* theory it presses today. *See* Motion at 8 ("Other courts that have faced similar circumstances, particularly after dismissing substantive constitutional violation claims on legislative immunity grounds, have dismissed the derivative *Monell* claims."); *see also Snyder v. Kraus*, 2010 WL 3419890, at *2 (E.D. Pa. Aug. 27, 2010); *Grimes v. Miller*, 448 F. Supp. 2d 664, 675 (D. Md. 2006). To the extent those cases support the Defendant's theory, however, they provide cold comfort against the overwhelming weight of authority *from circuit courts of appeals* we've cited here. *See, e.g.*, *Mervilus v. Union Cnty.*, 73 F.4th 185, 196 (3d Cir. 2023) ("Where it is possible for the *Monell* defendant to cause constitutional harm without any individual defendant violating the plaintiff's rights, it is not inconsistent for a jury to find only the *Monell* defendant liable."); *Stucker v. Louisville Metro Gov't*, 2024 WL 2135407, at *5–6 (6th Cir. May 13, 2024) ("Our sister circuits have expressly and widely held that a municipality may be liable for constitutional violations even absent a successful claim against an offending officer if the outcome is not inconsistent with *Monell*'s holding."); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) ("[A] municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an *inconsistent* verdict."); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1186 (9th

Cir. 2002) ("[A] municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred."). We therefore join the chorus of appellate cases that have declined to countenance this distortion of *Monell*.

**b. The Motive Argument**

We turn next to the Defendant's back-up argument. Even if the AC "overcame the hurdle of alleging that the County ratified Commissioner Hardemon's unconstitutional decision," the Defendant says, the AC nonetheless "failed to allege that the County ratified the *unconstitutional basis* for such decision." Motion at 9. So, in the Defendant's view, our MTD Order "held that a legislative body's knowledge of an allegedly unlawful motive by one of its members was enough to establish ratification of that motive by the full legislative body," despite the fact that "knowledge is not enough." *Ibid.* In other words, the Defendant maintains, our MTD Order never actually held that "the Board of County Commissioners, the final policymaker, ratified the allegedly *unconstitutional basis* for Commissioner Hardemon's allegedly *unconstitutional decision*." *Id.* at 10.

We disagree. Our MTD Order expressly found that the Plaintiff "offers six allegations to support its claim that the 'County Commission and individual Commissioners were aware of, *and acquiesced in*, Commissioner Hardemon's unlawful conduct.'" MTD Order at 10 (emphasis added) (quoting AC ¶ 83). We explained that, under the standard Federal Rule of Civil Procedure 12(b)(6) demands, the "six allegations indicate that the County knew about *and approved of* Hardemon's refusal to platform the resolution for an extension vote—and that it did so despite knowing about his (supposedly) *animus-based rationale*." *Ibid.* (emphases added). We further found that, drawing those required inferences, it's "plausible to believe that" the County "*assumed responsibility* for Hardemon's actions." *Id.* at 10–11 (emphasis added). And we concluded that "the AC plausibly alleges that the Commission *made that decision with animus* against the Plaintiff[.]" *Id.* at 11 (emphasis added). We

therefore reject the contention that our decision allowed the Plaintiff's *Monell* claim "to survive simply based on the Board's alleged knowledge of an allegedly unconstitutional motive of one of its members—without more[.]" Motion at 13.

"[T]he language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 426 (2024) (Gorsuch, J., concurring) ("[I]t would be a mistake to read judicial opinions like statutes."); *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("[W]ords of our opinions are to be read in the light of the facts of the case under discussion."). But the Defendant appears to do just that, attempting to evade *Monell* liability by seizing on a perceived ambiguity in the MTD Order. That attempt fails. We held then—and reemphasize today—that the AC sufficiently alleged that the County agreed with Hardemon's decision *and* with the animus that animated his decision.

The Plaintiff's theory may well fall apart at the summary-judgment stage. *See* MTD Order at 11 ("[T]he Defendants point out that 'there are a plethora of reasons that could justify the Commission's vote, including Plaintiff's noncompliance with the requirements of the Infill Program.' True enough. But, at this stage of the case, the Plaintiff need only identify *one* viable reason for the Commission's decision to freeze funding and order an audit." (citation omitted)). But it survives the motion-to-dismiss phase of this case.

## II. The Procedural-Due-Process Challenge

That brings us to the Defendant's final argument. Our MTD Order found that the "AC adequately pleads a deprivation of property based solely on the allegation that the Plaintiff 'has incurred tens of thousands of dollars in citations because the lots remain undeveloped.'" MTD Order at 13 (quoting AC ¶ 80); *see also id.* at 14 ("In plausibly alleging that it 'incurred' those 'assessments' and that the process available to it under Florida law leaves it stuck within 'a state of limbo,' the Plaintiff has done enough to survive the MTD." (quoting AC ¶¶ 79–80)). According to the Defendant,

however, that analysis "overlooked the legal distinction between legislative and adjudicative action." Motion at 13. Pointing to *75 Acres, LLC v. Miami-Dade Cnty.*, 338 F.3d 1288 (11th Cir. 2003), the Defendant insists that the Eleventh Circuit's holding there "compels this Court to conclude that [the] Plaintiff, who failed to take advantage of the mechanisms of democratic government, received all the due process constitutionally due." *Id.* at 16 (cleaned up).

"In deciding what the Due Process Clause requires when the State deprives persons of life, liberty or property, the Supreme Court has long distinguished between legislative and adjudicative action." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020). When "[t]he State . . . deprives persons of liberty or property through legislative action," "the affected persons are not entitled to *any* process beyond that provided by the legislative process." *Ibid.*; *see also City of N. Miami v. FAA*, 47 F.4th 1257, 1277 (11th Cir. 2022) ("We have described legislative action as general laws that apply to more than a few people[.]" (cleaned up)). "In contrast, the Due Process Clause may require individual process when a State deprives persons of liberty or property through adjudicative actions—those that concern a 'relatively small number of persons' who are 'exceptionally affected, in each case upon individual grounds,' by the state action." *Jones*, 975 F.3d at 1048 (quoting *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915)).

In *75 Acres*, the Eleventh Circuit considered this legislative-adjudicative divide in the context of a county ordinance that "require[d] the County Manager to impose a building moratorium on certain parcels of real property without affording [ ] procedural due process[.]" *75 Acres*, 338 F.3d at 1289; *see also id.* at 1290 ("Pursuant to § 33–319(k)(1) of the Miami–Dade County Code, the County Manager was required to issue an administrative order prohibiting the issuance of building permits on 75 Acres' property as soon as the County Manager learned that an information had been returned charging Vera with accepting unlawful compensation in a zoning case related to that property."). The panel concluded that the imposition of the mortarium was a *legislative* act because,

even though "the County's moratorium ordinance ha[d] been applied specifically to 75 Acres' property," the "language of § 33–319(k)"—"a generally applicable ordinance"—"d[id] not limit the ordinance's application solely to 75 Acres' property." *Id.* at 1297.

In reaching that conclusion, the panel said that "one aspect of § 33–319(k)" gave it "pause": "the pivotal role the State Attorney plays in triggering the imposition of a moratorium." *Id.* at 1297. Whereas other cases involve deprivations "triggered by the occurrence of a legislatively-defined condition unrelated to any government action," the panel explained, the moratorium at issue there had been "imposed only after the State Attorney"—"a government official who makes factual determinations and exercises official discretion"—"file[d] a criminal information." *Ibid.* Still, the court concluded that "the State Attorney's act of filing a criminal information [wa]s best characterized as a legislatively-defined condition precedent that d[id] not transform the imposition of a moratorium under § 33–319(k) from a legislative act to an adjudicative act." *Id.* at 1298. And that was because the plaintiff sought a hearing for the sole purpose of contesting the "validity of *the moratorium*"—*not* the "State Attorney's decision to file a criminal information." *Id.* at 1297 (cleaned up & emphasis added). So, because the plaintiff challenged *only* "the legislature's judgment that no building permits should be issued on real property implicated in zoning fraud" instead of "the State Attorney's factual determinations and discretionary act," the court determined that the plaintiff "was not entitled to procedural due process protections when the County Manager, acting without discretion, heeded the legislative command of § 33–319(k) and imposed a moratorium on 75 Acres' property after the criminal information was filed." *Id.* at 1298.

Our Defendant believes that *75 Acres* proves "strikingly similar[ ]" to—and indeed "control[s]"—this case. Motion at 16. But our Plaintiff *isn't* challenging a statute. It's instead challenging the imposition of "tens of thousands of dollars in citations because the lots remain undeveloped." AC ¶ 80; *see also id.* ¶ 85 (alleging that the Plaintiff was "assessed tens of thousands of

dollars in citations related to NANA's unfinished construction sites"). And, if anything, the government conduct at issue here more closely the sort of "exercise of discretion" about which *75 Acres* warned. *75 Acres*, 338 F.3d at 1297.

Compare our Plaintiff's allegation to cases in which the Eleventh Circuit has applied *75 Acres*. The Eleventh Circuit has held that a Senate bill implementing an amendment to the Florida Constitution counts as a legislative act. *See Jones*, 975 F.3d at 1049 ("The legislative and constitutional-amendment processes gave the felons all the process they were due before Florida deprived them of the right to vote and conditioned the restoration of that right on completion of their sentences."). It has determined that "the amendment of [a] zoning ordinance [i]s a legislative act." *O'Neal Homes, Inc. v. City of Orange Beach*, 333 F. App'x 428, 430 (11th Cir. 2009). So too a "general provision that affected a large number of persons and area, 200 acres in all, rather than being specifically targeted at [the plaintiff himself] or his immediate neighbors." *Busse v. Lee Cnty.*, 317 F. App'x 968, 972 (11th Cir. 2009); *see also Kentner v. City of Sanibel*, 750 F.3d 1274, 1280 (11th Cir. 2014) ("Because plaintiffs are challenging the Ordinance on its face rather than contesting a specific zoning or permit decision made under the auspices of the Ordinance, we conclude that they are challenging a legislative act. The Ordinance applies to all properties within the entire Bay Beach Zone, not just those owned by the plaintiffs." (citations omitted)). And the Eleventh Circuit has done the same for airport-navigation procedures, *see City of N. Miami*, 47 F.4th at 1277 ("The Metroplex Project plainly is not an adjudication. The FAA acted pursuant to statutory authorization, planned for a prospective project, and affected the 'rights' of tens of millions of people. Thus, Burkett's procedural due process claim fails."), as well as a salary schedule for public-school teachers, *see Alvarez v. Sch. Bd. of Miami-Dade Cnty.*, 2021 WL 2935366, at *4 (11th Cir. July 13, 2021) ("There is no indication that the School Board used a different process when it adopted the November 2014 schedule than it did for any other schedule, for example.").

This case stands in stark contrast to those examples. In its case against the Defendant, our Plaintiff isn't challenging a statute, a zoning ordinance, or *any* legislative directive. It merely "pleads a deprivation of property *based solely* on the allegation that the Plaintiff has incurred tens of thousands of dollars in citations because the lots remain undeveloped." MTD Order at 13 (cleaned up & emphasis added). And, as we've explained, "'the issuance of a citation and fine' suffices for a claim asserting 'a deprivation of property resulting from state action.'" *Ibid.* (quoting *Kupke v. Orange Cnty.*, 293 F. App'x 695, 698 (11th Cir. 2008)). Holding otherwise here would mean that administrative-fines challenges cannot be brought as procedural-due-process claims—a result that would be impossible to square with binding precedent from this Circuit and persuasive precedents from others. *See, e.g.*, *Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1327 (11th Cir. 2023) ("[O]ur precedents establish that a due-process right attaches to the imposition of civil or administrative penalties."); *Cnty. of Suffolk, New York v. First Am. Real Est. Sols.*, 261 F.3d 179, 195 (2d Cir. 2001) ("Due process requires that before a . . . significant civil or administrative penalty attaches, an individual must have fair warning of the conduct prohibited by the statute or the regulation that makes such a sanction possible.").

Resisting this conclusion, the Defendant insists that our holding as to Count III cannot coexist with our legislative-immunity holding. *See* Motion at 17 ("[T]he Court's analysis of Plaintiff's procedural due process claim is inconsistent and in direct contravention of controlling and binding Eleventh Circuit precedent[.]"). We disagree. In finding that legislative immunity protects *Hardemon*, we focused on *Hardemon's* "discretionary choices related to the deliberative and communicative processes by which legislators pass laws"—namely, "declining to put forward an extension vote" and "moving to cut funding." MTD Order at 5. In finding that the Plaintiff stated a plausible procedural-due-process claim against the *County*, however, we focused *not* on Hardemon's voting choices but on the simple fact that the Plaintiff has (allegedly) incurred fines issued by the *County*. *See* AC ¶ 85 ("[T]he

County . . . assessed tens of thousands of dollars in citations[.]"). Those two inquiries are different—at least at this early stage of the case.[2]

"[T]he line between legislation and adjudication is not always easy to draw, especially when the extent of the legislative domain is extremely limited[.]" *LC& S, Inc. v. Warren Cnty. Area Plan Comm'n*, 244 F.3d 601, 603 (7th Cir. 2001) (Posner, J.); *see also Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 274 (1st Cir. 2011) ("More importantly, not all government actions fall neatly into these polar categories."). Indeed, "[t]here is no dispositive test to determine which actions are executive and which are legislative, because local governing bodies often do both." *Kentner*, 750 F.3d at 1280; *see also Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands."). On the record before us, we cannot say that a challenge to the imposition of "tens of thousands of dollars in citations because the lots remain undeveloped," AC

[2] The Defendant *might've* but *didn't* invoke *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197 (6th Cir. 2011), in which the Sixth Circuit linked its procedural-due-process analysis to its legislative-immunity discussion. *See id.* at 218 ("Because we determined in our analysis of the teachers' procedural-due-process claim that the Board was performing a legislative function, we conclude that the members of the Board are entitled to legislative immunity in their *individual* capacities."). But our holding would remain the same even if the Defendant *had* raised that argument.

In *Smith*, the government conduct at issue appears to have been the same in both the procedural-due-process and the immunity context. *Compare id.* at 217 ("Because the Board engaged in legislative activity when it made the budgetary determinations that eliminated the alternative school, we hold that the Board did not violate the teachers' procedural-due-process rights. The Board's decision to abolish the alternative school and contract with Kingswood in order to save money was the result of weighing budgetary priorities, a legislative activity."), *with id.* at 218 ("Even if the Board did not have the power to abolish the alternative school under Tennessee law, the Board members may still enjoy legislative immunity as individuals in federal court for their legislative actions, sound or unsound."). Here, by contrast, the AC presents us with *two* different catalysts: the tabling of the vote (and slashing of funding) on the one hand, and the imposition of fines on the other. So, while we recognize that the two analyses might often intersect, the particular allegations of *our case* yield a different result.

¶ 80—given the specific factual allegations at issue here—amounts to a challenge to a legislative act that's "general in nature," that "covers a large group of individuals beyond . . . this case," and that operates "without prejudice." *Perez v. KIPP DC Supporting Corp.*, 2024 WL 3534769, at *9 (D.D.C. July 25, 2024) (Contreras, J.).

Procedural due process may have "nothing to do with [a] case" when "a law of general applicability . . . affects all [citizens] equally," when that law "was passed by [the] legislature," and when it requires "[n]o individualized determination." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1289 (11th Cir. 2020) (Lagoa, J., concurring); *see also ibid.* ("The 'process' that Georgia's voters are entitled to before their late-arriving ballots are rejected is the process that inured during the enactment of the law itself."). But this is a case about a party incurring fines for the stalled development of land due to the individualized decision-making of a single city commissioner. *See Harris v. Cnty. of Riverside*, 904 F.2d 497, 502 (9th Cir. 1990) ("[T]he County's decision to alter its proposed General Plan Amendment specifically to rezone Harris' land constituted a decision which was distinct from, rather than a part of, approval of the General Plan Amendment. This decision . . . concerned a relatively small number of persons (Harris and the immediately adjacent landowner) rather than the entire population of the West Coachella Valley."); *Johnson v. Quander*, 370 F. Supp. 2d 79, 91 (D.D.C. 2005), *aff'd*, 440 F.3d 489 n.7 (D.C. Cir. 2006) (explaining that *75 Acres* and cases with similar "logic address issues regarding land-use regulations" and thus are "not analogous" to other contexts).

We therefore see no tension between our MTD Order and Eleventh Circuit precedent. Indeed, our outcome comports with *75 Acres*, which explained that targeted, one-off decisions—at the hands of "a government official who makes factual determinations and exercises official discretion"—*can* pose procedural-due-process problems. It also complies with the Second Circuit test *75 Acres* followed, which "focuses on the function performed by the decisionmaker to make the determination." *75 Acres*, 338 F.3d at 1296; *see also Thomas v. City of New York*, 143 F.3d 31, 36 n.7 (2d

Cir. 1998) ("Adjudicative facts are facts about the parties and their activities, businesses, and properties, as distinguished from general facts which help the tribunal decide questions of law and policy and discretion. Local Law No. 51 directs the TLC to consider what look like adjudicative facts (such as the 'fitness of the applicant') in making its decisions." (cleaned up)). And it adheres to the Seventh Circuit's approach *75 Acres* explicitly invoked, which "focuses on the generality and prospectivity of government action[.]" *75 Acres*, 338 F.3d at 1296; *see also LC&S*, 244 F.3d at 604 ("If the Williamsport town council had imposed a fine on the plaintiffs, or provided that only the plaintiffs had to apply for permission to operate a tavern in the town's commercial district, the amendment would have lacked either prospectivity (in the first example) or generality (in the second); it might even have been a bill of attainder. But the amendment operated prospectively, regulating a future use but not imposing a sanction for past conduct.").

More fundamentally, our outcome accords with the animating principle of the legislative-act doctrine. Citizens are "not entitled to procedural due process above and beyond that which is already provided by the legislative process" because they're expected to "take advantage of the mechanisms of democratic government" in the first instance, when the legislative decision is "enacted." *75 Acres,* 338 F.3d 1293, 1298; *see also id.* at 194 ("When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process."). In other words, the "large number of people affected by the legislative process ensures that the legislature will act reasonably." *Cnty. Line Joint Venture v. City of Grand Prairie*, 839 F.2d 1142, 1144 (5th Cir. 1988). But when government conduct affects only *one* entity, not the general population, "the need for additional procedural protections is greater because political remedies are often unattainable by individuals or small groups, and the grant of procedural safeguards to a few does not impose as great a burden on government." *Onyx Props. LLC v. Bd. of Cnty. Comm'rs of Elbert Cnty.*, 838 F.3d 1039, 1046 (10th Cir. 2016) (citations omitted).

We'll close by reiterating what our MTD Order makes plain: Our Plaintiff may well fail to clear the summary-judgment hurdle. For Count III to ultimately survive, the Plaintiff "will need to produce viable evidence establishing (among other things) that it *paid*—and lacks sufficient state-law avenues to challenge—th[e] fines" at issue here. MTD Order at 14. We leave that inquiry for another day. What matters here is that the Plaintiff adequately asserts a procedural-due-process claim stemming from the imposition of monetary fines. We reject the Defendant's attempt to refashion Count III into anything else.

## CONCLUSION

After careful review, therefore, we **ORDER and ADJUDGE** that the Defendant's Motion for Reconsideration [ECF No. 60] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on October 9, 2026.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record